Alfred M. SHAFTER, as next friend of the dependents and next of kin of Joaquin Farina Muniz, and for such other persons as may be similarly situated, such as dependents and next of kin of Georg Joseph Kostka, Gerhart Rudi Richard Klatt, Dieter Ahrens, Koch Lothar Ludwig Wilmes and Gunter Schikulla, and Karl-Heinz Weinhold, Plaintiffs,

v.

UNITED STATES of America, Defendant and Third-Party Plaintiff,

v.

Alfred M. SHAFTER, as next friend of the dependents and next of kin of Georg Joseph Kostka, Dr. Horst Willner, as Administrator of the Estate of Georg Kostka, Deceased, the owner of the GERMAN MOTORSHIP DIRK, Albingia Versicherungs-Aktiengesellschaft, and the British Marine Mutual Insurance Association Ltd., Third-Party Defendants.

No. 65 Ad. 1136.

United States District Court
S. D. New York.
July 26, 1967.

Jacob Rassner, New York City, for plaintiffs and third-party defendant, Shafter, Bernard Shafter, New York City, of counsel.

Robert M. Morgenthau, U. S. Atty. for Southern Dist. of New York, Louis E. Greco, Atty. in Charge, Admiralty and Shipping Section, Dept. of Justice, for United States, Bruno E. Ristau, Washington, D. C., Philip A. Berns, New York City, of counsel.

Haight, Gardner, Poor & Havens, New York City, for third-party defendants, MacDonald Deming, New York City, of counsel.

FRANKEL, District Judge.

On February 10, 1964, an American Government vessel, the USNS BLUE JACKET, collided with a fishing boat, the M/V DIRK, on the Weser River in the territorial waters of the Federal Republic of Germany. Six members of the DIRK'S seven-man crew were killed; the seventh survived, but suffered physical injuries. In this lawsuit, brought on November 16, 1965, by the surviving crew member and a representative of those whose lives were lost, recovery is sought from the United States under the Public Vessels Act, 46 U.S.C. § 781 et seq. for the pain, suffering, and other damages attendant upon the deaths and personal injuries.[1] The Government has moved for summary judgment dismissing the suit, asserting that the matter has been withdrawn from the court's subject-matter jurisdiction by the provisions of the North Atlantic Treaty Status of Forces Agreement ("NATO-SOFA") of June 19, 1951, 4 U.S.T. 1792, to which the Federal Republic of Germany acceded by a Supplementary Agreement of August 3, 1959, effective July 1, 1963, 14 U.S.T. 531. Those treaty arrangements, the Government contends, create a comprehensive and exclusive scheme for adjudication and settlement of claims within their purview. The argument appears to be clearly correct. The only question initially creating some doubt as to whether the motion should be granted is whether the BLUE JACKET, at the time of the disaster, was part of a "force" governed by the provisions of NATO-SOFA.

### I.

Article VIII, paragraph 5 of NATO-SOFA provides in pertinent part (4 U.S.T. at 1806–08):

"Claims * * * arising out of acts or omissions of members of a force or civilian component done in the performance of official duty, or out of any other act, omission or occurrence for which a force or civilian component is legally responsible, and causing dam-

---

1. The libel as originally filed contained a count for the loss of the DIRK. This property-damage claim has been withdrawn from the present suit, and is be-fore the Court in another, separate action (66 Ad. 132) to which further reference will be made below.

age in the territory of the receiving State to third parties, \* \* \* shall be dealt with by the receiving State in accordance with the following provisions:—[2]

"(*a*) Claims shall be filed, considered and settled or adjudicated in accordance with the laws and regulations of the receiving State with respect to claims arising from the activities of its own armed forces.

"(*b*) The receiving State may settle any such claims, and payment of the amount agreed upon or determined by adjudication shall be made by the receiving State in its currency.

"(*c*) Such payment whether made pursuant to a settlement or to adjudication of the case by a competent tribunal of the receiving State, or the final adjudication by such a tribunal denying payment, shall be binding and conclusive upon the Contracting Parties.

"(*d*) Every claim paid by the receiving State shall be communicated to the sending States concerned together with full particulars and a proposed distribution in conformity with sub-paragraphs (*e*) (i), (ii) and (iii) below. In default of a reply within two months, the proposed distribution shall be regarded as accepted.

"(*e*) The cost incurred in satisfying claims pursuant to the preceding subparagraphs and paragraph 2 of this Article shall be distributed between the Contracting Parties, as follows:—

"(i) Where one sending State alone is responsible, the amount awarded or adjudged shall be distributed in the proportion of 25 per cent. chargeable to the receiving State and 75 per cent. chargeable to the sending State.

"(ii) Where more than one State is responsible for the damage, the amount awarded or adjudged shall be distributed equally among them; however, if the receiving State is not one of the States responsible, its contribution shall be half that of each of the sending States.

"(iii) Where the damage was caused by the armed services of the Contracting Parties and it is not possible to attribute it specifically to one or more of those armed services, the amount awarded or adjudged shall be distributed equally among the Contracting Parties concerned: however, if the receiving State is not one of the States by whose armed services the damage was caused, its contribution shall be half that of each of the sending States concerned.

"(iv) Every half-year, a statement of the sums paid by the

---

2. Definitions of terms in Article I include the following (4 U.S.T. at 1794):

"(*a*) 'force' means the personnel belonging to the land, sea or air armed services of one Contracting Party when in the territory of another Contracting Party in the North Atlantic Treaty area in connexion with their official duties, provided that the two Contracting Parties concerned may agree that certain individuals, units or formations shall not be regarded as constituting or included in a 'force' for the purposes of the present Agreement;

\* \* \* \* \*

"(*d*) 'sending State' means the Contracting Party to which the force belongs;

"(*e*) 'receiving State' means the Contracting Party in the Territory of which the force or civilian component is located, whether it be stationed there or passing in transit."

There is no question that the United States is a "sending State;" that West Germany is the "receiving State;" and that the plaintiffs herein are "third parties" within the terms of the Agreement.

receiving State in the course of the half-yearly period in respect of every case regarding which the proposed distribution on a percentage basis has been accepted, shall be sent to the sending States concerned, together with a request for reimbursement. Such reimbursement shall be made within the shortest possible time, in the currency of the receiving State.

"(f) In cases where the application of the provisions of sub-paragraphs (b) and (e) of this paragraph would cause a Contracting Party serious hardship, it may request the North Atlantic Council to arrange a settlement of a different nature.

"(g) A member of a force or civilian component shall not be subject to any proceedings for the enforcement of any judgment given against him in the receiving State in a matter arising from the performance of his official duties.

"(h) Except in so far as sub-paragraph (e) of this paragraph applies to claims covered by paragraph 2 of this Article, the provisions of this paragraph shall not apply to any claim arising out of or in connexion with the navigation or operation of a ship or the loading, carriage, or discharge of a cargo, other than claims for death or personal injury to which paragraph 4 of this Article does not apply."

Two conclusions follow for the present case from the foregoing treaty language:

(1) If the wrongs alleged arose out of "acts or omissions of members of a force or civilian component done in the performance of official duty, or out of any other act, omission or occurrence for which a force or civilian component is legally responsible," the claims of the "third parties" suing here were subject to adjudication or settlement by the Federal Republic of Germany under its applicable law and procedure.

(2) The jurisdiction thus created would displace the remedy plaintiffs invoke under the Public Vessels Act.

Plaintiffs assail both these propositions with arguments of variable substance.

First, they stress that the Government has not questioned the jurisdiction of this court under the Public Vessels Act to consider the claims for property damage arising out of the same collision. Not only is it anomalous, they argue, to distinguish death and personal injury claims from suits for harm to property; more importantly, they urge, the Government's acknowledgment of jurisdiction over the pending property-damage cases is required by the relevant treaty language and is likewise required in this case. For this contention plaintiffs repeatedly, in their brief and other papers, quote from paragraph 5(h) of Article VIII, ending the quotation just before the words underscored here (4 U.S.T. at 1808):

"[With immaterial exceptions,] the provisions of this paragraph shall not apply to any claim arising out of or in connexion with the navigation or operation of a ship or the loading, carriage, or discharge of a cargo, *other than claims for death or personal injury* to which paragraph 4 of this Article does not apply." [3]

It is unnecessary to linger over the fallacy plaintiffs propose beyond recording the court's strong disapproval of such truncated and misleading quotations.

As to the point that jurisdiction of a foreign State under NATO-SOFA should be deemed to preclude the remedy

---

3. Paragraph 4, immaterial here, is a waiver of claims by the contracting Governments against each other for injuries or deaths suffered by members of their armed forces in the course of official duties.

they invoke, plaintiffs appear to urge that this would effect an impermissible "repeal by implication." This argument is not frivolous, but it must in the end be rejected. There is no doubt that the later provisions of NATO-SOFA are to be harmonized so far as possible with those of the Public Vessels Act. It seems equally clear that the specific and detailed remedial apparatus under the later treaty should be deemed to substitute *pro tanto* for the general consent to suits under the statute. In giving its assent to NATO-SOFA, the Senate noted specifically both the benefits and the burdens of the jurisdictional agreement. It was observed that disposition of third-party claims by the Government of the place where the asserted wrong occurred (normally the country of the claimant's citizenship or residence, as in the case of the claimants here) would promote fairness, ease friction, and, incidentally, be likely to result in awards against the United States more modest than those commonly recovered in American courts. It was mentioned approvingly that 25% of such awards would be borne under the treaty by the receiving State. And it was recognized that the United States was undertaking the same jurisdictional burdens, and procuring the same benefits, for American citizens injured by foreign NATO forces stationed in this country.[4] Cf. Robertson v. United States, 111 U.S.App.D.C. 136, 294 F.2d 920 (1961).

Implementing the treaty arrangement, the Congress has made specific provision for the appropriation of funds with which the Secretary of Defense is to reimburse foreign Governments for our share of awards on claims of the kind in question. Act of September 7, 1962, Title I, § 113(a), 10 U.S.C. § 2734a.

■ It seems clear, then, that the specific provisions of NATO-SOFA should be read to exclude the concurrent and inconsistent jurisdiction plaintiffs invoke under the Public Vessels Act. Hijo v. United States, 194 U.S. 315, 324, 24 S.Ct. 727, 48 L.Ed. 994 (1904); cf. Tag v. Rogers, 105 U.S.App.D.C. 387, 267 F.2d 664 (1959), cert. denied, 362 U.S. 904, 80 S.Ct. 615, 4 L.Ed.2d 555 (1960).

■ Resisting this conclusion, plaintiffs' counsel states in an affidavit opposing the Government's motion (p. 12) that "a denial of the right of these decedents' claimants * * * to prosecute their claims in the jurisdiction of this Court would be tantamount to a wanton, arbitrary, willful, unwarranted, and unlawful denial of due process and equal protection of the laws in violation of the Fourteenth (XIV) Amendment of

4. See S.Exec.Rep.No. 1, 83d Cong., 1st Sess., pp. 13–14 (1953):

"IX. CLAIMS PROCEDURES

"The procedures for settling civil claims seem to the committee to be fair and just and calculated to reduce to a minimum the friction that almost inevitably arises from torts committed by members of the force or civilian component against members of the local population. In the case of torts committed in the performance of duty, the local citizen who is injured proceeds against his own government exactly as he would if the injury had been caused by a member of his own government's armed forces. His own government settles the claim and is committed to pay 25 percent of the damages (thus safeguarding against excessive settlements) while the sending state whose national is at fault pays the other 75 percent. There is some reason to expect that such a procedure will result in smaller settlements than adjudication by American claims officers, with greater satisfaction of the claimants. Experience has shown that local officials are likely to take a more moderate view than Americans of monetary damage.

"In the case of tortious acts or omissions not done in line of duty, the person damaged can sue the person responsible. But, because it was felt that most soldiers would not be able financially to pay substantial damages, the person wronged also is given an additional remedy through his own government.

"It is important to note that these protections for local populations are reciprocally available to American citizens who may be injured by foreign troops in the United States."

the Constitution * * *." [5] The reference to the Fourteenth Amendment is not the foremost among the errors in this hyperbolic sentence. There is nothing unfair or irrationally discriminatory in recognition by our Government of exclusive jurisdiction in a civilized foreign State over disputes concerning events and people within the territory of that State. Cf. Wilson v. Girard, 354 U.S. 524, 77 S.Ct. 1409, 1 L.Ed.2d 1544 (1957); Reid v. Covert, 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957); United States ex rel. Toth v. Quarles, 350 U.S. 11, 76 S.Ct. 1, 100 L.Ed. 8 (1955).

## II.

There remains the question which appeared at the outset to be one of probable substance: whether there is or can be any genuine issue of fact concerning the status of the ship BLUE JACKET as part of a treaty "force" so as to leave a meaningful doubt that the provisions of NATO-SOFA are applicable.

It is interesting if not decisive that both the present claimants and agencies subrogated to their interests proceeded, before the institution of this lawsuit, on the premise that NATO-SOFA governs the matter. Representatives of the deceased crew members and the surviving plaintiff Weinhold all filed claims with the Defense Costs Office in Bremen, an administrative tribunal of first instance,

for damages incurred in the collision. Similarly, two German social insurance carriers, as subrogees on account of compensation payments they were (and are) making to the next of kin and the surviving crew member, sought indemnity from that agency. In each instance, the German tribunal took jurisdiction, considered the claims on their merits, and rejected them, holding, *inter alia*, that the collision had been caused solely by improper navigation of the DIRK. German law provides for court review of those rulings. The two insurance carriers are following that course. The individual claimants, having determined to transfer their efforts to this court, have abandoned their German proceedings following the adverse adjudications at the first level.[6]

Still weightier on the jurisdictional issue is the fact that the American authorities responsible for administering such problems and the "competent tribunal" in Germany were in agreement that the matter lay within the authority of the latter agency. As a result of those concurrent determinations, the United States became bound under the treaty, Article VIII(e), to pay 75% of any awards the German decision might order, and the German Government rendered itself liable for the remaining 25%. Quite apart from these conclusive practical consequences, "the meaning given [to trea-

5. In the omitted remainder of the sentence, reference is made to a 1956 Treaty of Friendship, Commerce and Navigation with the Federal Republic of Germany upon which plaintiffs place heavy and mistaken reliance.

6. There might be substantial ground for holding that the adjudications in Germany, under a jurisdiction plaintiffs invoked, bar the present suit on grounds of *res judicata*. Cf. Treinies v. Sunshine Mining Co., 308 U.S. 66, 60 S.Ct. 44, 84 L.Ed. 85 (1939); Stoll v. Gottlieb, 305 U.S. 165, 59 S.Ct. 134, 83 L.Ed. 104 (1938); Hilton v. Guyot, 159 U.S. 113, 16 S.Ct. 139, 40 L.Ed. 95 (1895); Regierungspraesident Land Nord. W. v. Rosenthal, 17 A.D.2d 145, 232 N.Y.S.2d 936 (1st Dep't 1962). As noted just below in the text, responsible American authorities concurred in the view of the

German tribunal that the cases were properly before it under NATO-SOFA. Even apart from that concession, it would appear that a German ruling either way would have been binding upon the United States under paragraph 5(c). Article VIII, of the Agreement, which, to repeat it, states that a "settlement" or "adjudication" "by a competent tribunal of the receiving State," granting or denying payment, "shall be binding and conclusive upon the Contracting Parties."

In its arguments supporting the present motion, the Government has verged upon, but not explicitly asserted, arguments of *res judicata* or collateral estoppel. In view of the court's ruling against plaintiffs on the jurisdictional point, it becomes unnecessary to reach a final conclusion on this subject.

ties] \* \* \* by the departments of government particularly charged with their negotiation and enforcement is given great weight." Kolovrat v. Oregon, 366 U.S. 187, 194, 81 S.Ct. 922, 926, 6 L.Ed.2d 218 (1961).

Nevertheless, the court has gone on plaintiffs' premise that it must determine for itself the jurisdictional issue posed by the Government's motion. Ibid.; cf. Robertson v. United States, 111 U.S.App. 136, 294 F.2d 920, 922–923 (1961).[7]

Here, plaintiffs argued, we encounter the triable issue mentioned earlier: whether the BLUE JACKET was "in fact" part of a NATO "force" at the time of the collision. Supporting the affirmative of this question, the Government's initial papers supplied imposing support for the view on which both the German and American authorities have proceeded. The pertinent treaty definitions, the Government emphasized, describe a "force" to include the "land, sea or air armed services of one Contracting Party when in the territory of another Contracting Party \* \* \* in connexion. with their official duties \* \* \*." NATO-SOFA Art. I, par. 1(*a*). And the definitions sensibly contemplate that a "force" may be "stationed" in the territory of a receiving State "or passing in transit \* \* \*." Id., subpar. (*e*).

Building upon these definitions, the Government has demonstrated the following undisputed facts: The BLUE JACKET was at all material times a ship of the United States Navy, operated under Navy Department jurisdiction by the Military Sea Transportation Service (MSTS). Her master and crew were civil service employees of MSTS. At the time of the incident in question, and for some years before, the ship was engaged in regular voyages from Norfolk, Virginia, to Bremerhaven, Germany, carrying cargoes of frozen and chilled foodstuffs for discharge by the U. S. Army and distribution to NATO military and civilian personnel. Because Article 57 of the Supplementary Agreement governing NATO forces in Germany (14 U.S.T. 531, 597) confers a right of passage to NATO "forces" and "civilian components," the BLUE JACKET entered German waters on these voyages merely upon the giving of notice, without the diplomatic clearance normally obtained for non-NATO vessels.

On these facts, as noted earlier, both the U. S. Army Claims Office in Germany and the German Defense Costs Office concluded that exclusive jurisdiction over the present claims for death and personal injury resided with the latter agency.

■ In opposition to the Government's showing, the plaintiff Shafter, who appears also as co-counsel for plaintiffs, made an affidavit reporting conferences and a personal inspection aboard the BLUE JACKET on November 28, 1964. At that time, at least, Mr. Shafter swore (p. 2), the BLUE JACKET "was not a vessel under the NATO Command as it did not have the NATO insignia, the letter 'N' required to be placed on the exterior of the vessel on all vessels under the NATO Command." Upon oral exploration of this assertion, however, it proved to be baseless, and it has been withdrawn. It is undisputed that under Article 10 of the Supplementary Agreement (14 U.S.T. at 547–48), vessels "used by a force" in the Federal Republic of Germany must "bear a distinctive *nationality mark*, in addition to a registration number or other appropriate identification mark." (Emphasis added.) It is also undisputed that the BLUE JACKET bore such markings. Since there was no ground for the claimed requirement of a letter "N," the absence of such a symbol, contrary to the initial Shafter affidavit, is immaterial.

Apart from their abandoned notion about the letter "N," plaintiffs offered nothing in opposition that could have been deemed to create or indicate a genuine issue as to any material fact. Plaintiffs pressed, however, the plausible ar-

---

7. "Obviously, if the Contracting Parties *agree* that an individual is not a member of a force, this appellant is without recourse in the courts." Id. at 922 n. 10.

gument that the pertinent information about the BLUE JACKET was peculiarly available to, and lodged with, the Government. They contended that the case could not be deemed appropriate for decision without a trial until they had exhausted intra-government sources of possibly material knowledge.

Out of the abundant caution appropriate when the right to try real factual issues is at stake, the court ordered, and the parties agreed upon, a program of discovery. Pending completion of these inquiries, decision on the motion was postponed. In the event, however, the claimed need for further discovery proved to be extremely modest. Forgoing additional deposition testimony from the BLUE JACKET'S master, for which they had asserted some necessity on the argument of the motion, plaintiffs settled for a stipulation that:

> (1) there are "no special documents, telegrams, etc., which state specifically that the BLUE JACKET was assigned to NATO other than those papers previously submitted by the Government in its motion papers;" and (2) the BLUE JACKET "was owned and operated by MSTS and received its sailing orders from that agency."

These propositions were undisputed even before the stipulation.

 The facts so stipulated are said, nevertheless, to render substantial plaintiffs' argument that a vessel (or, presumably, any other vehicle or personnel unit) could be part of a "force" under NATO-SOFA only if some formal paper "assigned" it to a "NATO command," and that the lack of such a written assignment shows the BLUE JACKET was not part of a "force" within pertinent treaty language. The terms of the treaty do not support, but serve to refute, this contention.

The governing definitions, reviewed earlier, describe a "force" as "belonging to the land, sea or air armed services *of one Contracting Party * * *.*" Article I(*a*), 4 U.S.T. at 1794 (emphasis added). Article VIII contemplates spe-

cifically and pervasively that the "forces" it governs will normally be under, part of, and identified with their respective contracting Governments, not with some merged "NATO command." And the definitions recognize that components of such forces may either be stationed more or less permanently in a receiving state "or passing in transit" from time to time. Article I(*e*).

In short, like their abandoned creation concerning the letter "N," the requirement plaintiffs propose of a documentary "assignment" lacks any basis in the relevant treaty provisions. It remains clear that the American authorities, the German tribunal, and the plaintiffs themselves were correct when all proceeded on the judgment that these claims were within the jurisdiction of the Federal Republic under NATO-SOFA.

The motion for summary judgment is granted. Judgment will be entered dismissing the complaint. So ordered.