**JOHNSON CONTROLS, INC., et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

No. 708–81C.

United States Claims Court.

June 13, 1985.

See also, 1 Cl.Ct. 256.

Mark H. Berens, Chicago, Ill., for plaintiffs; Wm. Bruce Hoff, Jr., and Michele Odorizzi, Mayer, Brown & Platt, of counsel.

Helene M. Goldberg, Washington, D.C., with whom was Acting Asst. Atty. Gen. Richard K. Willard, for defendant.

## OPINION

NETTESHEIM, Judge.

This case is before the court after argument on defendant's motion for summary judgment. Plaintiffs oppose.

### FACTS

Plaintiffs [1] allege the existence of an implied-in-fact contract between Johnson Controls, Inc., a Wisconsin Corporation ("Johnson"), and the United States to compensate Johnson for extra work on a construction project in which Johnson originally had been engaged as a subcontractor. The project involved the installation and testing by Johnson of intrusion detection devices at 25 North Atlantic Treaty Organization ("NATO") sites in the Federal Republic of Germany (the "FRG"). The purpose of the work, part of a larger project known as the Long Range Security Program (the "LRSP"), was to provide security protection for storage sites for certain highly sensitive weapons. Alternatively, plaintiffs argue that Johnson was a third-party beneficiary of contractual duties allegedly owed by the United States to the FRG under the "Construction Order," which served as the prime contract for the project.

#### 1. *The Status of Forces Agreements*

The basic multilateral agreement establishing the mutual rights and obligations of the NATO host countries and the allied forces stationed on their soil is contained in the Agreement Between the Parties to the North Atlantic Treaty Regarding the Status of Their Forces, June 19, 1951, 4 U.S.T. 1792, T.I.A.S. No. 2846 ("NATO–SOFA"). This treaty, *inter alia*, vests in tribunals of the "host country" jurisdiction over claims arising from tortious acts, *id.* art. VIII, and criminal jurisdiction (often concurrent with that of the "sending states'" military tribunals) over offenses against the laws of the host country, *id.* art. VII, committed in the host country by members of a "visiting force."

A review of "[t]he cases decided by the tribunals of the world" has led one commentator to conclude that "absent an agreement, practically the only situation where a claim of immunity [from local jurisdiction by a member of a visiting force] has been recognized has involved an offense committed in the line of duty...." Schwartz, *International Law and the NATO Status of Forces Agreement*, 53 Colum.L.Rev. 1091, 1104 (1953); *accord* Re, *The NATO Status of Forces Agreement and International Law*, 50 Nw.U.L.Rev. 349, 390 (1955). Thus, in denying the habeas corpus petition of an American serviceman sought to be delivered up to stand trial in Japan under the terms of an executive agreement with Japan similar to NATO-SOFA, the Supreme Court partially based its decision on Japan's exclusive jurisdiction absent the agreement over offenses against its laws committed within its borders. *Wilson v. Girard*, 354 U.S. 524, 529, 77 S.Ct. 1409, 1411, 1 L.Ed. 1544 (1956); *accord Smallwood v. Clifford*, 286 F.Supp. 97 (D.D.C.1968) (President did not exceed authority by concluding Korean Status of Forces Agreement without Senate approval, because Korean SOFA gave United States jurisdiction it otherwise would not have had).

During World War II, the United States nonetheless insisted on concluding agreements with countries in which United States forces were stationed that conferred on U.S. Military authorities exclusive jurisdiction over offenses committed in those lands. In the United Kingdom, the United States of America (Visiting Forces) Act of 1942 exempted only U.S. servicemen from the concurrent criminal jurisdiction otherwise reserved in the British courts by the Allied Forces Act of 1940 over members of all allied forces in Britain. When the American armed presence abroad became

---

**1.** Johnson Controls, AG, a wholly-owned Swiss subsidiary of Johnson Controls, Inc., was added as a plaintiff because the Government questioned whether Johnson Controls, Inc., was the real party plaintiff in interest. For purposes of ruling on this motion, the court deems Johnson Controls, Inc., to be the real party in interest.

permanent after World War II, such arrangements became a psychological thorn in the side of the NATO alliance. The Senate Foreign Relations Committee reported on the proposed provisions on criminal jurisdiction that

[e]xclusive criminal jurisdiction, amounting to extraterritoriality, itself creates difficult problems. In the eyes of the local population, it sets Americans apart as a special, privileged class, and this fact acts as a constant irritant. . . . [T]he existence of exclusive criminal jurisdiction seems to the other country to be an infringement of its sovereignty.

Quoted at 99 Cong.Rec. 4,674 (1953). NATO–SOFA alleviated such problems by lessening the appearance of the American presence as an occupation. *See generally* Beesley, *The Law of the Flag, the Law of Extradition, the NATO Status of Forces Agreement, and Their Application to Members of the United States Army National Guard,* 15 Vand.J.Transnat'l L. 179, 194–209 (1982).

NATO–SOFA, as well as other mutual security agreements concluded by the United States during this period, also gave host countries greater control over the procurement of goods and services within their territory by visiting forces. Article IX provides in part:

2. Goods which are required from local sources for the subsistence of a force or civilian component shall normally be purchased through the authorities which purchase such goods for the armed services of the receiving State. In order to avoid such purchases having any adverse effect on the economy of the receiving State, the competent authorities of that State shall indicate, when necessary, any articles the purchase of which should be restricted or forbidden.

3. Subject to agreements already in force or which may hereafter be made . . . the receiving State shall assume sole responsibility for making suitable arrangements to make available to a force or a civilian component the buildings and grounds which it requires, as well as

facilities and services connected therewith. These agreements and arrangements shall be, as far as possible, in accordance with the regulations governing the accommodation and billeting of similar personnel of the receiving State. In the absence of a specific contract to the contrary, the laws of the receiving State shall determine the rights and obligations arising out of the occupation or use of the buildings, grounds, facilities or services.

*See also* Annex to the Agreement of May 5, 1951, on the Status of United States Personnel and Property, May 8, 1951, United States—Iceland, art. 6, 2 U.S.T. 1533, 1542, T.I.A.S. No. 2295; Administrative Agreement Under Article III of the Security Treaty Between the United States of America and Japan, Feb. 28, 1952, United States—Japan, art. XII.2, 3 U.S.T. 3341, 3349, T.I.A.S. No. 2492.

Under the occupation regime still in force in West Germany, a different system was employed. The United States Army issued "Requisition Order—Demands" to German firms for its requirements. The requisition orders were not contracts, but commands of the occupying force to which obedience was mandatory. The requisitioning authority gave the German suppliers payment orders directed to German finance agencies, which paid the suppliers from funds which the German Government was required by the Occupation Statute to supply for occupation costs. *See generally Best v. United States,* 154 Ct.Cl. 827, 292 F.2d 274 (1961).

The Occupation Statute was abolished by the Protocol on the Termination of the Occupation Regime in the Federal Republic of Germany, Schedule I, art. 1, Oct. 23, 1954, 6 U.S.T. 4117, 4121, T.I.A.S. No. 3425 (the "Protocol"), which was ratified with the advice and consent of the Senate, 101 Cong.Rec. 4232–33 (1955), and entered into force on May 5, 1955. With the entry into force that same day of the Protocol to the North Atlantic Treaty on the Accession of the Federal Republic of Germany, Oct. 23, 1954, 6 U.S.T. 5707, T.I.A.S. No. 3428, the

FRG was invited to become a member of NATO and did so the next day. Article 1 of the Protocol, 6 U.S.T. at 4118–19, incorporated, *inter alia*, the Convention on the Rights and Obligations of Foreign Forces and their Members in the Federal Republic of Germany, 6 U.S.T. 4278 (the "Convention"), which contained detailed provisions instituting new procedures for meeting the procurement needs of the allied forces. Schedule I, article 8 of the Protocol, 6 U.S.T. 4126–27, amended the Convention to provide that it

> shall remain in force until the entry into force of new arrangements setting forth the rights and obligations of the forces of the Three Powers and other States having forces in the territory of the Federal Republic. The new arrangements will be based on the [NATO–SOFA] ..., supplemented by such provisions as are necessary in view of the special conditions existing in regard to the forces stationed in the Federal Republic.

The new arrangements were embodied in the Agreement To Supplement the Agreement Between the Parties to the North Atlantic Treaty Regarding the Status of Their Forces with Respect to Foreign Forces Stationed in the Federal Republic of Germany, Aug. 3, 1959, 14 U.S.T. 531, T.I. A.S. No. 5351 ("SOFA/SA"). The Convention and related agreements were abrogated effective on the entry into force of SOFA/SA on July 1, 1963. Agreement on the Abrogation of the Forces Convention, the Finance Convention and the Tax Agreement, Aug. 3, 1959, 14 U.S.T. 686–87, T.I. A.S. No. 5351. On June 1, 1963, the FRG acceded to NATO–SOFA itself under SOFA art. XVIII.3, 4 U.S.T. at 1818, as contemplated by SOFA/SA. 14 U.S.T. at 537.

SOFA/SA made special provision for determining criminal jurisdiction, art. 17, 14 U.S.T. at 551–52, and incorporated the tort claims settlement procedures of NATO–SOFA, with supplementary provisions. Art. 41.1; 14 U.S.T. at 567. Subject to the

provisions of NATO–SOFA, art. IX.2, regarding purchases which may have an adverse effect on the German economy, SOFA/SA allows visiting forces to procure goods and services directly, art. 47.2–3, applying their own procedures "provided ... that they respect the principles applying in the Federal Republic regarding public procurement which are reflected in the regulations concerning competition, preferred tenderers, and prices applicable to public contracts; ..." and inform the German Government. Art. 47.4, 14 U.S.T. at 580. Article 49.2, 14 U.S.T. at 586, creates an exception for construction works which "shall normally be carried out by the German authorities competent for Federal building in accordance with German legal provisions and administrative regulations in force, and in accordance with special administrative agreements." [2]

One of the administrative agreements referred to is the "Fixed Price/Cost Reimbursement Architect-Engineer-Construction Basic Contract" or "Dollar-Baukontrakt" (the "DBK"), dated Oct. 27, 1956, between the United States, represented by the Commander-in-Chief, United States Army, Europe, and the FRG, represented by the Minister of Finance. The DBK, whose provisions have been observed by both governments up to the time of the instant controversy, Affidavit of Allan B. Aaron, Feb. 17, 1982, ¶ 5, establishes the detailed procedures whereby the FRG procures construction services for the United States pursuant to the policy of SOFA/SA article 49.2. In this contract the FRG binds itself to perform services called for in "Construction Orders" issued by U.S. contracting officers. Construction Orders constitute binding contracts between the United States and the FRG. DBK ¶ 1.c. Upon the issuance of a Construction Order, the cognizant FRG ministry issues a decree and fund authorization to state-level authorities which, in turn, place an order with the local construction agency, or Bau Amt, having

---

**2.** An exception to the exception exists for "minor construction projects" and "exceptionally, in other cases." ¶ 3(a), (b).

jurisdiction over the project location. Aaron Aff. ¶ 6f. The Bau Amt then solicits proposals; awards "subcontracts," subject to the approval of the U.S. contracting officer; and administers them "in accordance with German laws and regulations relating to [FRG] Government construction...." DBK ¶ 4.b(1).

SOFA/SA article 44.1–5 sets forth the rights and obligations of both governments in case of disputes arising from contracts concluded by the FRG for the account of visiting forces. Paragraph 6 provides in part:

> (a) Disputes arising from direct procurement by the authorities of a force or of a civilian component of goods and services in the Federal territory shall be settled by German courts or by an independent arbitration tribunal. Where the German courts are to decide the dispute, the plaint shall be lodged against the Federal Republic, which shall conduct the case in its own name in the interest of the sending State....
>
> (b) Agreements between the Federal Republic and a sending State shall, however, take precedence over the provisions of sub-paragraph (a) of this paragraph.

One of the agreements referred to in paragraph 6(b) was concluded the same day, among several United States Status of Forces Agreements with West Germany— the Agreement between the Federal Republic of Germany and the United States of America on the Settlement of Disputes Arising Out of Direct Procurement, 14 U.S.T. 691, T.I.A.S. No. 5352, article 3 of which provides in part:

> Disputes shall be settled in accordance with the provisions specified in the contract signed by the contracting parties. Where the contract contains no provisions to this effect, plaints ... shall be lodged with the German courts against the Federal Republic which shall conduct the case in its own name in the interest of the United States; ...

### 2. *The Transactions at Issue*

On May 18, 1977, the United States Army Engineer Division, Europe, issued the initial Construction Order for the intrusion detection systems involved in this case. The Order recited that "[p]ursuant to the Exchange of Letters concerning offshore construction projects ... dated 8 August 1956 and 27 October 1956, and subject to the terms ... [of the DBK] it is mutually agreed that the [German construction authorities] will perform the work in the time and for the amount set forth in the schedule." In accordance with standard procedure under the DBK, a single Bau Amt, Finanzbauamt Mainz, was given jurisdiction over the entire project, which was widely dispersed. Aaron Aff. ¶ 6f. After the German firm of Brown, Bovari & Cie AG tendered the most acceptable bid, the Construction Order was modified to reflect the amount of the bid and to provide, "The FRG will contract with Firm BBC, Mannheim...." for the work, and on July 31, 1978, Finanzbauamt Mainz concluded the contract with BBC. A joint venture to perform the work existed between BBC and Johnson, with which, however, the Bau Amt did not contract.

The Construction Order identified the project as a U.S. pre-financed NATO infrastructure project. When U.S. forces are to be the principal user of a project, which may be eligible for NATO common funding, and U.S. interests dictate high priority for the project, the United States may begin the project with its own funds with intent to recoup the funds when NATO funding for the project is finally approved. Aaron Aff. ¶ 7. Under the Construction Order, the FRG obligated itself "to take the necessary steps to recover NATO infrastructure common funds and to reimburse the U.S. Government the amount so recovered." Construction Order II.3.b. In order to be eligible for NATO fundings, it was necessary to procure the project in compliance with NATO international competitive bidding procedures. Aaron Aff. ¶ 9.[3]

---

**3.** Defendant analogizes this case to ones involving federal financing of works by non-federal

public agencies in which privity between the United States and the contractors on those

Under the terms of the consortium agreement, BBC and other entities were to perform the "civil work" under the contract, consisting mainly of preparing the site for the installation of the detection devices and installing them. The devices were to be procured, calibrated, and tested by Johnson. The specifications called for the use of commercially available, "off-the-shelf" detection devices designed to protect both buildings and the perimeters of the sites which enclosed the buildings. The equipment installed by Johnson at a prototype site failed to achieve the required performance levels, however, a situation that was exacerbated when Army representatives insisted on higher performance rates than specified in the original contract. Under threat of having its contract terminated, Johnson performed extra work to bring its system into compliance with the Army's exacting standards. Finally, BBC terminated Johnson's contract and completed the work without Johnson.

## DISCUSSION

It is beyond cavil in this circuit that a movant bears the burden of demonstrating the absence of all genuine issues of material fact. *Cooper v. Ford Motor Co.*, 748 F.2d 677, 679 (Fed.Cir.1984); *D.L. Auld Co. v. Chroma Graphics Corp.*, 714 F.2d 1144, 1146–47 (Fed.Cir.1983); *see Whitney Benefits, Inc. v. United States*, 752 F.2d 1554 (Fed.Cir.1985). This is not a case like *Adickes v. Kress & Co.*, 398 U.S. 144, 159–60, 90 S.Ct. 1598, 1609–10, 26 L.Ed.2d 142 (1970) (cited in *Skaw v. United States*, 740 F.2d 932, 937 (Fed.Cir.1984)), in which the proponent of summary judgment—defendant in that case—fails to negate every element of plaintiffs' cause of action. *See Contract Custom Drapery Service, Inc. v. United States*, 6 Cl.Ct. 811, 819 (1984). ▪ No defense to an insufficient showing in a summary judgment motion is required. *See* Fed.R.Civ.P. 56(e) advisory

committee note. Only when the moving party has established that no genuine issue of material fact exists, does the burden shift to the non-moving party to show that such a fact does exist. *Orchards v. United States*, 749 F.2d 1571, 1573, 1575–76 (Fed.Cir.1984) (discussed in *Anderson v. United States*, 7 Cl.Ct. 341, 342 (1985) (order denying motion for summary judgment)). Moreover, plaintiffs as the opponents of summary judgment must "receive the benefit of all applicable presumptions, inferences, and intendments." *Orchards*, 749 F.2d at 1574; *accord Langenegger v. United States*, 756 F.2d 1565, 1568 (Fed. Cir.1985). That said, however, the opponent of summary judgment has some obligation to raise the requisite issue of material fact:

> [T]he court may not simply accept a party's statement that a fact is challenged. *Union Carbide Corp. v. American Can Co.*, 724 F.2d at 1571, ... [Fed.Cir. 1984]. The party opposing the motion must point to an evidentiary conflict created on the record at least by a counter statement of a fact or facts set forth in detail in an affidavit by a knowledgeable affiant. Mere denials or conclusory statements are insufficient.

*Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd.*, 731 F.2d 831, 836 (Fed.Cir.1984); *accord First National Bank v. Cities Service Co.*, 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968); *D.L. Auld Co. v. Chroma Graphics Corp.*, 714 F.2d at 1150; *Clark Mechanical Contractors, Inc. v. United States*, 5 Cl.Ct. 84, 88 (1984); *Crawford v. United States*, 3 Cl.Ct. 323, 328 (1983) *aff'd mem.*, 732 F.2d 168 (Fed.Cir.), *cert. denied*, —— U.S. ——, 105 S.Ct. 194, 83 L.Ed.2d 127 (1984). It has been observed that the entitlement of the party opposing summary judgment to the rule of liberal construction of the pleadings in his favor ends if he fails to disclose the

works has been held not to result even from pervasive federal supervision. *See, e.g., D.R. Smalley & Sons v. United States*, 178 Ct.Cl. 593, 597–98, 372 F.2d 505, 507, *cert. denied*, 389 U.S. 835, 88 S.Ct. 45, 19 L.Ed.2d 97 (1967). Plaintiffs

counter that their claim is based on a separate implied-in-fact contract independent of the Construction Order and argue that defendant's analogy does not hold. It is not necessary to reach this issue.

merits of his defense. 6 J. Moore & J. Wicker, *Moore's Federal Practice*, § 56.-22[2], at 56–1337 (2d ed. 1982). Plainly, it is plaintiffs' burden to disclose the evidentiary basis for their claim if the facts making out a contract implied in fact or establishing a contract for the benefit of plaintiffs are to serve as a basis for denying defendant's motion for summary judgment. *See Pure Gold, Inc. v. Syntex (U.S.A.), Inc.*, 739 F.2d 624, 627 (Fed.Cir.1984); *Levi Strauss & Co. v. Genesco, Inc.*, 742 F.2d 1401, 1404 (Fed.Cir.1984).

### 1. *Implied-in-fact Contract*

■ As a subcontractor of BBC,[4] Johnson cannot sue the United States directly under the Construction Contract. *See United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1551–52 (Fed.Cir.1983); *Lasker-Goldman Corp. v. United States*, 4 Cl.Ct. 89 (1983). The same authority establishes that, even if Johnson had been in privity with the Bau Amt, Johnson could not sue the United States directly on a theory that the FRG was a mere conduit or purchasing agent for the United States, absent a contractual provision providing for direct liability of the United States to the subcontractor.

Johnson, however, alleges the existence of an implied-in-fact contract "[b]y virtue of (a) the relationship between the United States and the FRG and (b) the fact that the United States assumed complete *de facto* control of work at the prototype site...." Contentions of Fact and Law, ¶ 1. Plaintiffs do not contend that such direct supervision alone sufficed to create an implied-in-fact contract, but that in the process of constantly changing the specifications, United States representatives created a new contract. *See Newbery Alaska, Inc. v. United States*, 225 Ct.Cl. 608, 609 (1980) (order denying motion to dismiss). Plaintiffs admit that the United States refused to deal directly with Johnson most of the time. They nonetheless allege that, during the testing of the prototype site, government representatives were in direct communication with employees of Johnson. These representatives insisted upon the achievement of performance standards higher than those specified or than could be achieved with the specified equipment under conditions actually encountered at the site or than could be achieved under the more rigorous testing to which the Army insisted upon subjecting the equipment contrary to the specifications. According to plaintiffs, these individuals thereby required Johnson to perform extra work beyond the scope of the original specifications.

■ In order to prove the existence of an implied-in-fact contract, the claimant must "show mutuality of intent to contract, offer and acceptance, and that the officer whose conduct is relied upon had actual authority to bind the government in contract." *Orchards v. United States*, 749 F.2d at 1575 (citing, *inter alia*, *City of Alexandria v. United States*, 737 F.2d 1022 (Fed.Cir. 1984)); *see Airborne Data, Inc. v. United States*, 702 F.2d 1350, 1359–61 (Fed.Cir.

---

**4.** Among the Contentions of Fact and Law in its pretrial submission, Johnson asserts, as an alternative to its third-party beneficiary theory, that Johnson was a party to the Construction Contract between the Bau Amt and BBC. No affidavit or other document has been offered by plaintiffs in support of this contention as required by RUSCC 56(e). Although the Consortium Agreement lists joint preparation of a quotation for the work and joint contract performance as purposes of the Consortium, the agreement provides that the quotation will be "submitted to the customer by the lead consortium member" (BBC); that the lead member shall enter into an agreement in its own name, although on behalf of the consortium's account; that the consortium members will "act exclusively pursuant to this contract for the aforementioned project during the term of this contract"; that "[t]he lead member shall be solely obligated to the customer to perform the customer contract," whereas "in the internal relationship, only the other members shall be responsible for the performance of the obligations arising from the customer contract with respect to their shares of supplies and services...."; and that BBC shall be the lead member, *inter alia*, for purposes of "[t]he protection of the members' interests as against the customer and other authorities with whom negotiations are to be conducted." It is concluded that plaintiffs have failed to raise a genuine issue as to Johnson's participation in the Construction Contract.

1983); *Jarboe-Lackey Feedlots, Inc. v. United States,* 7 Cl.Ct. 329, 339–40 (1985); *Pacific Gas & Electric Co. v. United States,* 3 Cl.Ct. 329, 338–39 (1983), *aff'd mem.,* 738 F.2d 452 (Fed.Cir.1984); *Prevado Village Partnership v. United States,* 3 Cl.Ct. 219, 223–24 (1983); *Wertz v. United States,* 2 Cl.Ct. 45, 51–52 (1983).

Plaintiffs' affiants aver that the tests at the prototype site were "conducted and controlled entirely by the United States, its employees and agents," Affidavit of Frank Andres, Aug. 22, 1984, ¶ 6; that they had protested on Johnson's behalf that the testing and performance requirements went beyond those specified and required Johnson to perform extra work in order to upgrade the equipment to meet the Army's standards; and that Government representatives responded that they did not care what the specifications required and insisted, under threat of having the contract terminated, on performance of the tests and any additional work as and in the manner suggested by the United States, regardless of cost. *See, e.g.,* Andres, Aff. ¶¶ 7, 7(a), (b); Affidavits of Dieter Cordsen, Aug. 14, 1984, ¶¶ 3–5; and Peter Michael Clay, Sept. 5, 1984, ¶ 4.

In turn, Johnson's employees informed defendant's representatives that they expected extra compensation for the additional work. Andres Aff. ¶ 7; Cordsen, Aff. ¶ 6. Frank Andres, Director, Service and Maintenance for Johnson in Essen, FRG, avers that then-contracting officer Col. Glenn N. Smith, in response to Mr. Andres' expressing this position, "agreed that Johnson would be entitled to such compensation." Andres Aff. ¶ 7(e). Dieter Cordsen, then-co-project manager for Johnson's work on the LRSP, claims that the Corps' Area Contracting Officer for the Kaiserslautern area, Lt. Col. Edward Lee, repeatedly told him that "in his view, because of the repeated changes being made and extra work being required ... the existing fixed-fee form of contract was inappropriate [and that] ... the contract for LRSP work should have been let on a cost-reimbursement basis." Cordsen Aff. ¶ 7. William E. Keefe, then-Vice President and Managing Director for European Operations for Johnson, avers that contracting officer Col. Valentine E. Carrasco acknowledged that Johnson had performed extra work and incurred extra expense and would continue to do so "and that Johnson was entitled to be able to receive reimbursement for the additional work." Affidavit of William E. Keefe, Aug. 28, 1984, ¶ 4.

Peter Michael Clay, then-co-project manager with Dieter Cordsen, avers that he was "aware of the substance of a meeting" between Cordsen and Carrasco in which the latter insisted upon the performance of the extra work on pain of termination, Clay Aff. ¶ 4, and that he "thereafter understood that all subsequent instructions from United States representatives were to be taken in the same basic context...." Mr. Clay goes on to say that he also "understood that ... the United States had agreed in principle to compensate Johnson for additional work ... [and] that Johnson's claims and reservations of rights with respect to such additional work should be submitted to BBC ... who would then forward those claims and reservations of rights to the United States." *Id.* ¶ 5. "As a result of these understandings," Mr. Clay frequently communicated to BBC Johnson's objections to additional work being required of it and claims to compensation therefor. *Id.* ¶ 6.

■ Absent from all of these affidavits is any allegation that a United States representative manifested assent to contract directly with Johnson or assumed responsibility for paying Johnson otherwise than through the existing contractual chain. Defendant argues that plaintiffs' inability to show such assumption of direct liability by the United States is fatal to their claim. Plaintiffs, however, contend that such a showing is not necessary in order to show "an agreement implied-in-fact founded upon a meeting of the minds ... inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." *Balti-*

more & O.R.R. v. United States, 261 U.S. 592, 597, 43 S.Ct. 425, 426, 67 L.Ed. 816 (1923). According to plaintiffs, it is only necessary to show that United States representatives induced Johnson to perform the extra work, *see, e.g., Thomson v. United States*, 174 Ct.Cl. 780, 788, 357 F.2d 683, 688 (1966), and that they did so in the knowledge that Johnson expected to be paid therefor. *See, e.g., Pacific Maritime Ass'n v. United States*, 123 Ct.Cl. 667, 675, 108 F.Supp. 603, 607 (1952).

Plaintiffs argue that they are not required to show "that a contracting officer *specifically stated* that he was hiring Johnson to perform the additional work and agreed to pay it directly," because "[s]uch an agreement would be an express, not an implied, contract." Plfs' Br. filed Sept. 6, 1984, at 24 (emphasis added). *But see Narva Harris Construction Corp. v. United States*, 216 Ct.Cl. 238, 244, 574 F.2d 508, 511 (1978) ("In almost all such cases, there is some sort of oral representation. . . ."). Defendant's position does not call for such a showing; rather, defendant argues that plaintiffs must show such assent to pay Johnson directly by inference from the surrounding circumstances.

Such an implied or express assumption of direct liability is present or alleged in all the cases cited by plaintiffs.[5] In *Silverman v. United States*, 230 Ct.Cl. 701, 679 F.2d 865 (1982), a government official without authority to contract expressly promised to arrange for direct payment to plaintiff, a subcontractor for the same services, which promise the court held had been ratified when the Government subsequently accepted plaintiffs' services, leading to the formation "at least" of an implied-in-fact contract. *Id.* at 710, 679 F.2d at 871.

In *Newbery Alaska, Inc. v. United States*, 225 Ct.Cl. 608, plaintiff alleged in its petition that the United States "*agreed to pay* Rogers [plaintiff's predecessor] . . .

the additional expense incurred" by Rogers in installing, at the Government's insistence, larger conduits than necessary to satisfy the contract. 225 Ct.Cl. at 609 (emphasis added). After having denied the Government's motion to dismiss the petition, the United States Court of Claims granted its motion for summary judgment, reciting facts which indicated a dispute on the size of conduit required and finding an absence of record support for "the requisite meeting of the minds for an implied-in-fact contract." *Newbery Alaska, Inc. v. United States*, 229 Cl.Ct. 753, 754 (1982).

In *Narva Harris Construction Corp. v. United States*, 216 Ct.Cl. 238, 574 F.2d 508, plaintiff alleged express, but admittedly legally non-binding, oral promises by the Government to pay additional compensation for work plaintiff was bound to perform by simultaneously concluded written contracts. Plaintiff was entitled to prove "additional facts" which might convert a non-binding oral contract to an implied-in-fact contract. The court observed that, as an alternative to proceeding on the basis of an express oral promise, a showing of additional facts from which a meeting of the minds could be inferred might convert a nonjusticiable implied-in-law contract for *quantum meruit* into a contract implied in fact based on "an assent of the parties, as in express contracts." *Id.* at 244–45 & n. 6, 574 F.2d at 511 & n. 6.

In *Algonac Manufacturing Co. v. United States*, 192 Ct.Cl. 649, 428 F.2d 1241 (1970); *Thomson v. United States*, 174 Ct.Cl. 780, 357 F.2d 683 (1966); *Pacific Maritime Ass'n v. United States*, 123 Ct.Cl. 667, 108 F.Supp. 603 (1952); *Buffalo & Fort Erie Public Bridge Authority v. United States*, 106 Ct.Cl. 731, 65 F.Supp. 476 (1946), the Government either induced plaintiffs to perform the work or accepted their services, in both situations with

---

**5.** *Diamond Mfg. Co. v. United States,* 3 Cl.Ct. 424 (1983), offers no guidance on what must be shown to prove an implied-in-fact contract between the United States and a subcontractor and merely states that the formation of such a contract is possible. In *Chris Craft Industries,*

*Inc. v. United States,* 209 Ct.Cl. 700 (1976), the court did not reach the issue of formation of an implied-in-fact contract, finding that the alleged additional work was within the scope of the original subcontract.

knowledge that the plaintiffs expected to be paid therefor. Because all plaintiffs were in the position of prime contractors, in none of these cases was the Court of Claims faced with the issue of where the plaintiffs were to turn for payment. By using plaintiffs' services with the knowledge that they expected to be paid, the Government in each case impliedly assumed direct liability, because it knew that the plaintiffs expected to be paid by the Government. A factor in the outcome of *Buffalo & Fort Erie Public Bridge* was that "[t]here was no denial of a legal obligation on the part of the Government under the facts and circumstances to pay for the continued use of plaintiff's property...." *Id.* at 755, 65 F.Supp. at 480.

Authority for requiring a manifestation of Government assent to direct liability is found in *United States v. Johnson Controls, Inc.*, 713 F.2d 1541, in which plaintiff argued for circumvention of the contractual chain based on the theory that the prime contractor was a mere procuring agent of the Government, which, in turn, directly supervised the work. In rejecting this argument, the Federal Circuit pointed to the absence of a contractual provision providing that the Government was directly liable to the subcontractor as a "crucial factor" distinguishing *Johnson* from cases wherein privity was found between Government and subcontractor based on an agency theory. 713 F.2d at 1551. Also important to the decision were the Government's intent to use the prime contractor as a buffer between itself and the subcontractor, *id.* at 1552, and the subcontractor's having been put on notice that the Government would resist any direct appeal by a subcontractor. *Id.* at 1553.

### 2. *Jurisdiction of the German Courts*

■ Even if plaintiffs could prove the existence of an implied-in-fact contract with the United States, article 44.6 of SOFA/SA would deprive this court of jurisdiction over plaintiffs' suit on such a contract. Subparagraph (a) of that paragraph requires complaints arising from direct procurement by a force to be brought against the FRG in the German courts or settled by arbitration. Although, under subparagraph (b) of that paragraph, the Agreement on settlement of disputes arising out of direct procurement takes precedence over the provisions of subparagraph (a), article 3 of the Agreement directs complainants exclusively to their remedies in the German courts against the FRG, absent provision to the contrary "in the contract signed by the contracting parties." The alleged implied-in-fact contract, of course, contained no such conflicting forum selection provision.

Plaintiffs append to their motion a "Denkschrift" or memorandum of the FRG Secretary of State on SOFA/SA article 44 and other documentation of its negotiating history. The Denkschrift repeatedly refers to securing legal recourse for German contractors against visiting forces, which sovereign immunity exempted from the jurisdiction of the German courts, as the FRG's goal in negotiating the provisions dealing with direct procurement disputes in SOFA/SA. NATO–SOFA contained no regulations on the subject, while the requisition orders of the visiting forces did not guarantee legal protection in accordance with the needs of the German economy. The other documentation includes an unadopted draft provision submitted by the sending states which provides for direct procurement disputes with contractors resident in the federal territory. Based on these materials documenting the negotiating history, plaintiffs take the position that the provisions for settlement of disputes arising from direct procurements "in the Federal territory" should be construed to apply only to disputes with German contractors.

■ Although SOFA/SA is an executive agreement and not a treaty, the Protocol, which was ratified by the Senate and contemplated that SOFA/SA would be concluded, lends it the dignity of a treaty which other courts have accorded to it. *See Matter of Burt*, 737 F.2d 1477, 1478–79 n. 2 (7th Cir.1984); *Holmes v. Laird*, 459 F.2d 1211, 1213 n. 15 (D.C.Cir.1972) (citing

*Wilson v. Girard*, 354 U.S. 524, 527–29, 77 S.Ct. 1409, 1410–12, 1 L.Ed.2d 1544 (1957)). Because they are agreements between sovereign nations, treaties are to be construed more like contracts than like statutes in order to give effect to the intent of the parties. Where, however, the relevant words of the treaty are unambiguous, a court is not to look beyond their clear import unless necessary to avoid a result inconsistent with the intent or expectations of the parties. *Coplin v. United States*, 6 Cl.Ct. 115, 125–26 & nn. 11–12 (1984), *rev'd on other grounds*, 761 F.2d 688 (Fed.Cir. 1985). Interpreting SOFA/SA article 44.-6(a) and articles 1, 3 of the Procurement Disputes Agreement to cover all procurement disputes—not just those with German contractors—is consistent with the policy, evinced in SOFA/SA article 47, of requiring visiting forces to respect the principles of German public procurement law. It also is consistent with the policy that pervades NATO–SOFA and SOFA/SA of giving the host country as much control as possible over the procurement activities of visiting forces. The FRG has a plain interest in applying its laws through the medium of its courts to the formation of contracts by visiting forces within its territory. That in presenting its case to a German tribunal plaintiffs may be required to meet standards of proof or to overcome defenses that would not pose impediments in this court does not constitute a valid argument against the jurisdiction of the German courts.

Plaintiffs argue that interpreting the SOFA/SA to oust this court of its statutory jurisdiction would violate the interpretative canon disfavoring repeals by implication, in addition to raising due process issues because of the more limited discovery provided by the German legal system. This would not be the first court to hold that the specific provisions of the Status of Forces agreements should be substituted, insofar as they apply, for the general consent to suit in United States courts under preexisting statutes. *See Shafter v. United States*, 273 F.Supp. 152, 156 (S.D.N.Y. 1967). The court in *Shafter*, which in-

volved a claim under the Public Vessels Act, 46 U.S.C. §§ 781–790, for damages to a German fishing boat resulting from collision with a U.S. Government vessel, held that the tort claims provisions of NATO–SOFA article VIII, which are incorporated by SOFA/SA (art. 44.1, 14 U.S.T. at 567), "create a comprehensive and exclusive scheme for adjudication and settlement of claims within their purview." 273 F.Supp. at 153. This ousts "the concurrent and inconsistent jurisdiction plaintiffs invoke under the Public Vessels Act." *Id.* at 156. *See also Hannevig v. United States*, 114 Ct.Cl. 410, 84 F.Supp. 743 (1949). The court in *Shafter* rejected the notion that there was anything "unfair or irrationally discriminatory in recognition by our Government of exclusive jurisdiction in a civilized foreign State over disputes concerning events and people within the territory of that State." 273 F.Supp. at 157 (citing *Wilson v. Girard*, 354 U.S. 524, 77 S.Ct. 1409, 1 L.Ed. 1544 (finding no constitutional obstacle to handing over of U.S. serviceman to Japan pursuant to SOFA-like criminal jurisdiction agreement)). *See also The Bremen v. Zapata Offshore Co.*, 407 U.S. 1, 12, 92 S.Ct. 1907, 1914, 32 L.Ed.2d 513 (1972).

### 3. *Third-Party Beneficiary*

Plaintiffs also argue that Johnson is a third-party beneficiary of a modification to the Construction Order providing: "The FRG will ensure that any substitution of another subcontractor for Johnson Controls be submitted for review and qualified under the same [conditions] as applicable to Johnson Controls."

> To entitle one to sue as a third-party beneficiary of a contract to which he is not a party, the contract must reflect the intent not merely to benefit the third-party but also to give him the direct right to compensation or to enforce that right against the promisor.

*Baudier Marine Electronics v. United States*, 6 Cl.Ct. 246, 249 (1984) (citations omitted); *accord Berberich v. United States*, 5 Cl.Ct. 652, 655–56 (1984), *aff'd*

*mem. sub nom. Gallanger v. United States,* 770 F.2d 179 (Fed.Cir.1985). One obvious problem with this theory is that the FRG, not the United States, is the promisor regarding the obligation not to substitute another subcontractor. Moreover, BBC, which took over Johnson's share of the work, is not a substituted sub-contractor. BBC already was the prime contractor.

 Another claim premised on status as a third-party beneficiary is that U.S. representatives made incorrect statements at a pre-bid conference, or they were made in the presence of U.S. representatives without objection, to the effect that the specified performance rates had been almost achieved at other sites in Germany. These statements, plaintiffs contend, amounted to a warranty that the specified performance rates could be achieved with the specified equipment under German climatic conditions, which warranty plaintiffs allege to be false. This theory must be rejected. If Johnson's arguments for extending beyond the FRG the Government's warranties regarding the specifications are correct, then a subcontractor could also claim to be a third-party beneficiary of all the Government's other promises under the contract, including its promise to pay the contract price, and *de facto* privity would result in every case.

Plaintiffs urge that more discovery is necessary to flesh out their allegation that the work contracted for under the alleged implied-in-fact contract was different from that involved in the construction contract. Because the court has accepted that allegation as true for purposes of ruling on defendant's motion and has nonetheless found that defendant is entitled to judgment in its favor, plaintiffs' request for additional discovery correctly was denied by the judge before whom this case was then pending.

## CONCLUSION

Based on the foregoing, defendant's motion for summary judgment is granted, and the Clerk of the Court shall dismiss the complaint for lack of jurisdiction.

IT IS SO ORDERED.

No costs.