SKELTON, Senior Circuit Judge.
 

 This is an appeal from a final judgment
 
 *
 
 of the United States Claims Court in which the court awarded damages to the appellees, Eldon H. Dahl and wife, Jeanette M. Dahl, (herein called plaintiffs or Dahls), for breach of contract by the United States Government, appellant (herein called defendant), to make a loan to the Dahls through the Farmers Home Administration (FmHA), and for abuse of discretion by the officials of said agency. The purpose of the loan was to purchase livestock, feed, and farm machinery, pursuant to 7 U.S.C. §§ 1941-47 and 7 CFR 1800, et seq. Jurisdiction is conferred on this court by the Federal Courts Improvement Act of 1982, Public Law 97-164, 97th Congress, Sec. 127, Chapter 83, Title 28 U.S.C. (28 U.S.C. § 1295). The case was tried by Trial Judge Yock of the United States Court of Claims. We affirm in part and reverse in part.
 

 The plaintiffs are farmers living near Rushford, Minnesota. On October 4, 1976, they applied for a farm operating loan of $35,000 from the FmHA, an agency in the United States Department of Agriculture, to purchase dairy cows, farm equipment, feed and seed they planned to use on a farm they were going to purchase from a Mr. Merle Hatleli and wife with other funds. The FmHA makes low-interest loans to farmers who are unable to obtain credit elsewhere from commercial sources. 7 U.S.C. §§ 1941(a)(4) and 1983(a). In connection with their loan application, the Dahls submitted a statement of their assets and liabilities and a Farm and Home Plan which showed that on September 27, 1976, they had signed an earnest money contract to buy the Hatleli farm and personal property. The terms were $48,500 for the personal property and $160,000 for the real estate. Of the $16,000 cash down payment, which they made with other funds, $1,000 was applied to the real estate and $15,000 was applied to the personal property. Payment of the balance due on the personal property and closing of the personal property purchase were set for November 1, 1976. Possession of the farm was also to be given on November 1, 1976. The sale of the real estate was on a 20-year installment contract deed. An additional $39,000 was due on the real estate down payment on January 1, 1977, the date set for the real estate closing.
 

 
 *1375
 
 According to the plan, the plaintiffs proposed to use the $35,000 FmHA loan to pay the balance due on the personal property. Another proposal in the plan was that the Dahls would sell their golf course house for approximately $27,000 which was to be used on the down payment for the Hatleli real property.
 

 The processing of FmHA loan checks takes approximately 6 weeks after formal loan approval, which occurred on November 8, 1976. It was agreed by the Dahls and FmHA as a part of the plan that in order for the balance of the personal property down payment to be made on November 1, 1976, interim financing of $35,000 would be arranged for by the Dahls through a local bank. It was the custom and practice of Minnesota banks to grant FmHA borrowers interim unsecured loans for the purchase of personal property when the FmHA had obligated itself to the borrower and where funds had not yet been received at the local FmHA office. Accordingly, the Dahls arranged for the interim loan at a local bank. It was agreed that the FmHA was to pay the bank’s loan off when it received the loan checks from the FmHA’s Central Office in Kansas City if the loan had been used to purchase the personal property. Before making the interim loan, the local bank requested a written assurance from the FmHA that when the funds were received by the local FmHA office, they would be used to pay off the interim loan. In response to this request, the FmHA county supervisor sent the bank the following letter dated November 12, 1976:
 

 We have approved a $35,000 loan to enable Mr. Dahl to purchase livestock and machinery. If it becomes necessary for Mr. Dahl to purchase items included in our loan, we will be glad to pay them off at the time we get our funds.
 

 In early November, 1976, the plaintiff used the proceeds of the bank’s interim financing to pay the required $33,500 balance for the personal property. A dispute arose between the Dahls and the Hatlelis over the quality and condition of the personal property that the Dahls had purchased. The Dahls discovered that many of the cows had been misrepresented as being pregnant, and also there was not enough feed on hand to take care of the cows through the winter. Too, there were mechanical problems with the farm machinery. The Dahls consulted an attorney and thereafter, on December 2, 1976, without notice to the FmHA, they rejected the personal property by sending the Hatlelis a letter to that effect, but they continued with the purchase of the real estate portion of the transaction.
 

 Meanwhile, on November 26, 1976, Mr. Peterson, the county FmHA supervisor, notified the Dahls that the FmHA loan check had been received and that closing on the FmHA operating loan was scheduled for December 3, 1976. However, the loan closing was later rescheduled for December 13, 1976. On December 13, 1976, the FmHA farm operating loan for $35,000 was closed at the FmHA office in Preston, Minnesota. The loan provided for repayment in seven annual installments due on January 1 of each succeeding year. At the closing, plaintiffs signed a promissoiy note, a security agreement, and a deposit agreement for a supervised bank account.
 

 The proceeds of the FmHA loan were deposited in a supervised bank account at the First National Bank of Rushford. This is the normal financial arrangement in loans of this type where the FmHA supervises the borrower to make certain that the loan proceeds are used for the intended purposes of the farm plan. Withdrawals may be made only with the joint signatures of the county supervisor and the borrower. 7 CFR 1803.l-.il (1977). The security agreement provided that the FmHA would take an immediate security interest in the plaintiffs’ crops in the field or in the storage. No specific security interest was taken in the machinery and farm animals, except as to those items that might thereafter be acquired. Nothing was listed because the personal property part of the transaction was still in the process of settlement
 

 
 *1376
 
 The terms of the parties’ agreement, including the controlling regulations, were incorporated into the promissory note and security agreement. The pertinent sections of these instruments were as follows:
 

 Borrower agrees to use the loan evidenced hereby solely for the purposes authorized by the Government. [Line 9, page 2, Promissory Note].
 

 DEFAULT:
 
 Failure to ... perform any covenant or agreement hereunder shall constitute default... UPON ANY SUCH DEFAULT, the Government at its option may declare all or any part of any such indebtedness immediately due and payable. [Lines 15 and 17, page 2, Promissory Note].
 

 This note shall be subject to the present regulations of the Farmers Home Administration and to its future regulations not inconsistent with the express provisions hereof. [Line 21, page 2, Promissory Note].
 

 DEBTOR WARRANTS, COVENANTS AND AGREES THAT: Debtor will (1) use the loan funds for the purposes for which they were or are advanced, (2) comply with such farm and home management plans as may be agreed upon. [Section III.B., page 2, Security Agreement].
 

 This agreement is subject to the present regulations of the Secured Party and to its future regulations not inconsistent with the express provisions hereof. [Section IV(E), page 3, Security Agreement]. Failure by the Secured Party to exercise any right — whether once or often — shall not be construed as a waiver of any covenant or condition of the breach thereof. Such failure shall also not affect the exercise of such right without notice upon any subsequent breach of the same or any other covenant or condition. [Section IV(L), page 3, Security Agreement].
 

 On January 3, 1977, without the knowledge or consent of FmHA, the plaintiffs implemented the terms of a settlement agreement they had reached with the Hatlelis by entering into a final written contract with them whereby the plaintiffs agreed to purchase the real estate, without the personalty, for $165,000 instead of $160,000 originally agreed upon. The Hatlelis refunded approximately $10,500 of the cash payment, the balance constituting a down payment on the farm. Then, on January 6, 1977, with the money returned by the Hatlelis, plaintiffs repaid the bank $7,426.39 on the $35,000 interim loan, thus leaving a balance owing to the bank of some $27,573.61. The trial judge accurately sums up these facts on page 15 of his opinion, as follows:
 

 Despite having been used originally to purchase the Hatleli personal property, part of the bank’s interim loan money went towards the down payment on the real estate when the Hatleli personal property contract problem was settled. The bank’s monies were substituted for the funds that had been expected from the sale of the Dahl’s house.
 

 When the FmHA learned of the settlement the plaintiffs had made with the Hatlelis and their use of the interim financing to purchase real estate, the county supervisor wrote the following letter to the plaintiffs dated January 26, 1977:
 

 If the FmHA money is to be used to buy livestock, how are you going to pay the First National Bank for the advance they made which we all felt was for chattels, but apparently was used for farm down payment?
 

 At this point, the real estate market was slow and the Dahls could not sell their golf course house, which was to have yielded the money needed to repay the bank. In early February, 1977, the plaintiffs requested the FmHA to release some of the loan funds to buy dairy cows and to buy a tractor. The FmHA refused to release the funds until the plaintiffs had repaid the bank. The FmHA took the position that the plaintiffs had violated the agreement to use the interim financing to purchase personal property by using it to buy real estate. Also, the FmHA reasoned that the plaintiffs had changed their financial position since they applied for the loan and after their loan had been approved, because they now owed the
 
 *1377
 
 additional $27,573.61 to the bank and an additional $5,000 on the farm purchase price.
 

 The bank began to press the FmHA to pay the $27,000 due on the interim loan. It claimed that the FmHA letter of November 12, 1976, was a guarantee that the loan proceeds would be used to pay the interim loan.
 

 The FmHA took the position that there was no legal or moral commitment, (nor legal authority to pay) contained in the letter of November 12. It said that the letter was merely for information that the bank could use for whatever purpose it chose. The FmHA pointed out that there was no way it could repay a loan used to purchase real estate from operational loan funds approved for the purchase of personal property, as this would be contrary to the regulations of the agency, as well as a violation of plaintiffs’ agreement with the FmHA. 7 CFR 1831.10(b)(3), 1831.12(aX9), and 1802.14(h) (1977). The bank also asked the FmHA to take a mortgage on the plaintiffs’ golf course house, but the FmHA refused the request because the agency regulations prohibited the taking of such security for an operational loan.
 

 On April 29, 1977, the Dahls gave the bank a second mortgage on their golf course house to secure the interim loan, plus interest, in the total sum of $28,439.11. Thereafter, they again asked the FmHA to release the loan funds, but the FmHA refused because the Dahls still owed the debt to the bank even though it was secured.
 

 The FmHA state director, on the recommendation of the district director, wrote the bank on May 12, 1977, and unilaterally ordered the supervised bank account closed and the funds sent to the FmHA. The bank complied on May 25, 1977, and the $35,000 in the account was applied as follows: $1,187.41 to interest and $33,812.59 to principal, all of which was transferred to the FmHA.
 

 Finally, the Dahls paid the FmHA an additional $1,114.88 under protest as the FmHA would not otherwise release its security interest on their crops. This payment was applied as follows: $45.88 interest and $1,069 to principal. This closed out the entire Dahl transaction with the FmHA without any of the FmHA loan funds having been paid or released to the Dahls.
 

 On December 19, 1977, the Dahls filed suit in the United States Court of Claims against the government alleging that the FmHA had breached the loan contract and had abused its administrative discretion in terminating the loan transaction. They asked for damages in the form of anticipated profits they alleged they would have made in operating the dairy farm in 1977, 1978 and 1979 if they had received the proceeds of the FmHA loan. They also asked for the recovery of the payments of interest that they had made to the FmHA on the loan.
 

 The trial judge concluded that the FmHA had breached the contract and had abused its administrative discretion for which the plaintiffs were entitled to damages for anticipated profits in the proposed operation of the dairy farm during 1977, 1978 and 1979 in the sum of $34,472.01, and that they were also entitled to recover payments of interest they had made on the FmHA loan in the sum of $1,417.88, all in the total sum of $35,889.89.
 

 The principal issues in this case are whether the FmHA abused its discretion or breached the contract, the claim for damages, and the recovery of the interest payments. We consider them in the order listed.
 

 I. Abuse
 
 of Discretion and Breach of Contract
 

 The procedure for the making and supervision of operational farm loans to farmers by the government is substantially as follows. The Secretary of Agriculture, acting through the Farmers Home Administration, makes loans to farmers who are unable to obtain credit elsewhere. 7 U.S.C. §§ 1941(a)(4), 1983(a), (c); 7 CFR 1801.2(g), 1831.5(e). Pursuant to statutory direction, the Secretary has promulgated rules and regulations for the supervision of the borrower’s has stated
 
 *1378
 
 that supervisory procedures are necessary to achieve the objectives of the loan and to protect the interest of the United States. 7 U.S.C. § 1983(d); 7 CFR 1831.3; 7 CFR 1802.2.
 
 [1]
 
 To this end, loans are made to eligible applicants only after it is determined that the borrowers’ plan of operation has a reasonable chance of success. 7 U.S.C. § 1941(a)(2); 7 CFR 1831.5(c); 1831.-32(b)(l)(ii); 1801.3(a)(2), 1831.5.
 

 County Committee, composed of three local farmers, makes the determination whether a borrower is eligible for a loan. 7 CFR 1800.4, 1831.7. With assistance from the County Supervisor, the committee considers the total picture, including the borrower’s farming record, his proposal for the use of the loans, and a statement of his current financial condition, all as shown by a farm and home plan submitted by him. 7 CFR 1801.3. If the borrower is found to be eligible, the committee will certify the maximum amount of credit which may be made available by the County Supervisor, 7 CFR 1831.7, should he thereafter decide to approve the loan. In this case, the committee recommended on October 27, 1976, that plaintiffs be granted a loan not to exceed $35,000.
 

 The actual authority to approve a loan lies with the County Supervisor. It is his responsibility to protect the financial interest of the United States. 7 CFR 1802.5.
 
 [2]
 
 After a favorable certification is made by the County Committee, the County Supervisor must determine whether the plan of operation is feasible and whether the loan is to be used for authorized purposes and can be repaid. 7 CFR 1831.14. To make these determinations, he will discuss the intended plan of farming operations with the borrower. 7 CFR 1801.4. An authorized purpose of a loan may include the purchase of any farm related personal property, including animals and machinery. 7 CFR 1831.9. Operating loan funds may not be used to acquire an interest in real estate. 7 CFR 1831.10(b)(3), (4); 1831.12(a)(9).
 

 If the County Supervisor chooses to approve a loan, he will execute loan approval Form FmHA 440-1. Upon this document, which is also signed by the borrower, the County Supervisor certifies that the County Committee has declared the farmer to be eligible for the loan and that the government agrees to advance the loan, subject to the availability of funds and on the condition that the farmer continues to comply with his plan of operation and all pertinent regulations. 7 CFR 1831.34(a). The loan approval document mutually signed in this ease on November 8, 1976, specifically reminded the borrower that his future conduct had to conform to all governing regulations.
 

 Even though the County Supervisor may approve the loan, he is not required to lend the entire amount certified by the County Committee, but may withhold any or all monies if there have been any changed circumstances in the borrower’s implementation of his farm plan.
 
 See,
 
 7 CFR 1831.7 which provides that, “the maximum amount of credit established by the County Committee [in this case, $35,000] will not necessarily represent the amount which actually will be loaned.” 7 CFR 1831.32(b)(II) provides that:
 

 If it be found, after an applicant has been certified as eligible, that there will be a major change in operations or that an
 
 *1379
 
 amount of credit in excess of the maximum previously established by the County Committee will be required for the designated crop or operating year, it will be necessary for the County Committee again to certify the applicant as eligible on the basis of the changed circumstances if a loan is to be made.
 

 Having approved the loan, the County Supervisor then submits a request to the FmHA’s Finance Office in Kansas City to issue and forward the loan proceeds. 7 CFR 1831.35. Since there is ordinarily a 30-day delay period until the check is received, a borrower customarily arranges for interim financing with a local commercial bank. In such case the FmHA agrees with the borrower that it will pay off the interim financing with the pending loan proceeds as long as the borrower uses the bank’s interim financing for a purpose expressed in the farm and home plan. No legal relationship is created by this procedure between the FmHA and the bank, because County Supervisors have no authority to guarantee repayment of interim financing. 7 CFR 1831.8(b). There is, however, no statute or regulation that prohibits the parties from agreeing that the FmHA will pay off the interim financing so long as the borrower does not use the bank’s interim financing contrary to his agreement with the FmHA and his farm and home plan.
 

 Once the check is received from Kansas City, the loan may be closed. This procedure requires the execution of a promissory note, a security agreement, and a depository agreement by the borrower. At loan closing, pursuant to the depository agreement, the loan proceeds are placed into a supervisory bank account (SBA). 7 CFR 1803.7-11 and 7 CFR 1831.36(a).
 

 The SBA is an arrangement whereby the FmHA supervises the borrower’s use of the loan funds by making certain that he adheres to the terms of the original farm plan.
 

 7 CFR 1803.7(d)(3)(i). The depository agreement establishing the SBA provides that the borrower pledges the money as security “for the performance of [his] obligations and agreements .... ”
 

 The foregoing procedures were followed in this case, except that instead of buying the personal property with the interim loan fund, the plaintiffs used it as a down payment on the real estate purchase of the Hatleli farm. This was a clear violation of the agreement and of the regulations. The FmHA refused to pay the bank the interim loan when the FmHA funds arrived, because its regulations prohibited the use of operational funds to buy real estate. 7 CFR 1831.10(b)(3).
 
 [3]
 

 The trial judge held that at the time the bank account was closed, the Dahls were not in default because they had already made one payment which had become due and the next payment was not due until January 1, 1978. He also found that “they fulfilled all their duties under the contract.” It appears that the trial judge was of the opinion that the Dahls were not in default as long as they made the required payments on the note. We do not agree. They were in default for other reasons than the failure to make the note payments. For instance, they breached their agreement with the FmHA by using the interim bank loan to purchase real estate, and by increasing their personal debt liability subsequent to the approval of the loan contrary to the farm and home plan filed by them. These acts of the Dahls caused them to be in default under the terms of the note and security agreements executed by them. The conclusion of the trial judge that they were not in default when the account was closed is erroneous as a matter of law and must be rejected.
 

 The decision of the trial judge that the Dahls “fulfilled all their duties under the
 
 *1380
 
 contract,” to the extent that it is a finding of fact, is not supported by substantial evidence and must be set aside. To the extent such decision is a conclusion of law, it is erroneous and is overruled. When the FmHA refused to release the loan funds to pay off the interim loan at the local bank, the plaintiffs signed a note on April 29, 1977, for $28,439.11 to the bank, bearing interest at the rate of 10% per annum, payable annually, and secured by a mortgage on their golf course house. This financial obligation, added to the $35,000 FmHA loan, created a debt liability for the plaintiffs of $63,439.11. This combined debt, with the $5,000, plus interest, increase in the price of the farm, was a change in their economic position that had occurred since they applied for the FmHA loan and after it was certified and approved. Consequently, a finding made by the trial judge that the plaintiffs were in the same economic position on May 5, 1977, when they again asked for the release of the FmHA funds, that they were in when they presented their farm plan on October 4,1976, is not supported by substantial evidence, and is rejected.
 

 Where, as in this case, after an applicant has been certified as eligible for a loan, it is found that circumstances have changed, such as a change in operations or more credit will be required for the farm operation, the applicant must be certified again by the County Committee as eligible on the basis of the changed circumstances if a loan is to be made. 7 CFR 1831.32(b)(ii). In the instant case, the County Committee never issued a second certification that the plaintiffs were eligible for a loan on the basis of the changed circumstances that occurred after their original certification. Therefore, the FmHA was justified in refusing to disburse the loan funds to the plaintiffs.
 

 On April 23, 1977, a Mr. Bailey, the FmHA district director, requested the Dahls to co-sign a check to return the SBA funds to the FmHA, which would have terminated the operating loan contract. The Dahls refused the request. Thereafter, on May 5, 1977, Mr. Bailey forwarded the file to the state director with a recommendation that the loan be unilaterally terminated for two reasons, namely (1) the plaintiffs had used the local bank interim loan to buy real estate instead of personal property in violation of their agreement with the FmHA, thereby making it impossible for the FmHA to reimburse the bank, and (2) the plaintiffs debt picture had changed substantially because they now had a $63,439.11 debt liability, plus interest, much of which had not existed when the October 4, 1976, farm and home plan was executed and filed by the plaintiffs. The state director, after examining the file, in the exercise of his discretion, unilaterally withdrew the loan funds from the supervised bank, thereby terminating the loan.
 

 The regulations provide that a supervised bank account may be closed by unilateral action of the state director for the following reasons: death of the borrower, borrower in default, inactive borrower, or when the borrower is paid up. 7 CFR 1803.10(d). The trial judge ruled that none of these situations applies to the facts in this case. We do not agree. We have pointed out above that the plaintiffs were in default. This was enough to authorize the unilateral termination of the account and loan. The ruling of the trial judge in this regard is erroneous as a matter of law.
 

 The trial judge held that the refusal of the county supervisor to release the funds was ah abuse of discretion and a breach of contract by him. Again, we disagree. Wide discretion is conferred on county supervisors by the statutes and regulations to supervise loans and to see that assistance is given to farmers in order that the government may be sure that the money is spent for the purposes for which loans are made and that the interests of the government are protected. The decision of the court in
 
 McCormick v. United States,
 
 Ct.Cl. No. 515-79C (order entered April 10, 1981) is squarely in point. There, as here, the borrower claimed an abuse of discretion and a breach of contract by the county supervisor who refused to release additional funds on an operating loan of the kind before us. In that case, the court said:
 

 
 *1381
 
 We find no contractual breach resulting from the actions of Mr. Murrow [the County Supervisor]. The objectives of the supervision of the loans are established in 7 C.F.R. § 1802.2:
 

 (a) All loans made by FmHA are designed to assist individual borrower families to attain specific objectives. Therefore, each borrower family will be provided the supervision necessary to achieve those objectives and to protect the financial interest of the Government.
 

 ******
 

 We find the supervisory functions intended to be performed by Mr. Murrow are committed to the discretion of such supervisory personnel and, while the supervisor is to render assistance to recipients of these loans, said supervisors are also to protect the financial interests of the United States. 7 C.F.R. § 1802.2. It appears to us the supervisor must assist the borrowers by acting as a guide to the families and striving for the establishment of an efficient and successful enterprise. Nevertheless, the County Supervisor is also required to examine- the operations with a view to protecting the financial interests of the United States. If a reasonable opportunity for success appears unfeasible to the County Supervisor, we think the FmHA program also requires the County Supervisor to make certain the money loaned by the United States will be recouped. There appears to be no requirement for the County Supervisor to commit additional funds to a hopelessly losing venture; nor should we require the County Supervisor to alter payments if in his judgment that would create an unreasonable risk of loss to the United States.
 

 * *
 
 *
 
 * * *
 

 The determinations of feasible operations and realistic changes are committed to the discretion of the County Supervisor.
 

 Recovery for plaintiffs may be ordered only if Mr. Murrow abused his discretion. Because we can find no abuse of Mr. Murrow’s discretion on the facts before us, we grant defendant’s motion for summary judgment.
 

 In the instant case, the County Supervisor, in the reasonable exercise of his discretion, determined that in view of the changed circumstances that occurred in the affairs of the plaintiffs after their loan was approved, their proposed dairy farm operation could not succeed and they would not be able to repay the FmHA loan. Under these conditions, the supervisor had the right and also the duty, for the protection of the interests of the government, not to release the loan funds. We find no abuse of discretion or breach of contract on his part in refusing to disburse the funds to the plaintiffs. Accordingly, the holding of the trial judge that the County Supervisor abused his discretion and breached the contract is erroneous and must be rejected.
 

 The trial judge held further that the state director abused his discretion and breached the contract when he unilaterally closed the account and terminated the loan. We hold that the action of the state director in this regard was a reasonable exercise of his discretion in view of the default by the plaintiffs and by reason of the recommendation of the district supervisor. The termination and cancellation of the loan contract by the state director was accomplished in accordance with the statutes, the regulations, and the note and security agreement signed by the plaintiffs. Therefore, the director did not abuse his discretion nor breach the contract. The conclusions of the trial judge to the contrary are erroneous and must be set aside.
 

 Based upon the foregoing findings and conclusions, we hold that the plaintiffs have not stated a claim for damages for breach of contract or abuse of discretion by the officers of FmHA upon which relief can be granted.
 

 II.
 
 Damages
 

 In plaintiffs’ petition, they asked for an-would
 
 *1382
 
 have made in the operation of the dairy farm during the years 1977-1979 if the FmHA loan had been disbursed to them. The trial judge sustained this claim and recommended an award to the plaintiffs in the sum of $34,472.01 for such anticipated profits as damages for breach of contract and abuse of discretion by the officials of the FmHA. The defendant says that anticipated profits are speculative and consequential damages that cannot be recovered against the government. We find it unnecessary to reach or decide this issue. However, in view of our holding that the plaintiffs have not stated a claim for damages for breach of contract or abuse of discretion upon which relief can be granted, the recommended award of anticipated profits to the plaintiffs by the trial judge is rejected.
 

 III.
 
 Recovery of Interest Payments
 

 The plaintiffs made three payments of interest to the FmHA on the loan involved in this case in the total sum of $1,417.88 prior to the termination of the loan by the FmHA. The plaintiffs seek recovery of these interest payments. The trial judge approved their interest claim and recommended that judgment be entered in their favor for its recovery. The government says it is entitled to keep the interest payments on the theory that when the loan funds were deposited in the joint supervised bank account interest began to accrue at that time. This contention would have been a valid argument if the loan funds had eventually been paid to the plaintiffs. However, here the plaintiffs never received any of the loan funds. Under these circumstances, it would be unconscionable, inequitable, and an unjust enrichment of the government at the expense of the plaintiffs to allow it to retain the interest payments. It is undisputed that the FmHA unilaterally canceled the note and terminated and rescinded the entire loan transaction, and the loan funds were returned to the government. There is a well-established general rule that a party who rescinds a contract must place the other party in status quo by restoring the consideration or whatever he has received under the contract.
 
 See
 
 17A C.J.S.
 
 Contracts
 
 §§ 438 and 439, pp. 542-545; 17 Am.Jur.2d,
 
 Contracts,
 
 Sections 512 and 516, pp. 994-995 and 1002-1003; and
 
 New York Mail & News.Transp. Co. v. United States,
 
 154 F.Supp. 271 (Ct.Cl.1957),
 
 cert. denied,
 
 355 U.S. 904, 78 S.Ct. 332, 2 L.Ed.2d 260 (1957). The case last cited held in an opinion written by Mr. Justice Reed, who was sitting by designation:
 

 When an individual or the Government rescinds a contract, the parties are to be placed, as far as possible, in the position they would have occupied without the transaction. 154 F.Supp. at 276.
 

 Under this rule, when applied to the facts of this case, the government was required to return the interest payments to the plaintiffs. The trial judge was correct in recommending a judgment in their favor for its recovery.
 

 We affirm the judgment of the Claims Court for the recovery by plaintiffs of the interest payments in the sum of $1,417.88. We reverse the judgment of the Claims Court for the recovery by plaintiffs of anticipated profits as damages for alleged abuse of discretion and breach of contract by the officials of the FmHA, and remand these claims to the Claims Court with instructions to enter a judgment dismissing such claims.
 

 AFFIRMED IN PART AND REVERSED IN PART WITH INSTRUCTIONS.
 

 *
 

 Pursuant to an order of this court dated October 4, 1982, Judge Yock entered a judgment on October 8, 1982, corresponding to the decision recommended by the Trial Judge in this case.
 

 [1]
 

 . 7 CFR § 1802.2 Objectives of supervision.
 

 (a) All loans made by FmHA are designed to assist individual borrower families to attain specific objectives. Therefore, each borrower family will be provided the
 
 supervision necessary to achieve those objectives and to protect the ñnancial interest of the Government.
 
 (Emphasis added.)
 

 [2]
 

 . 7 CFR § 1802.5 Responsibility of County Supervisors.
 

 (a)
 
 In order to carry out effective supervision with families, County Supervisors must select the supervisory methods which will be most effective in helping each family and in protecting the interests of the Government;
 
 properly assist them to recognize and analyze their major problems; reach agreement with them with respect to how these problems can be resolved realistically; stimulate them to improve their situation to the extent that the desired progress is made; and, organize their work so that a proper portion of their time is used effectively for supervision. (Emphasis added.)
 

 [3]
 

 . 7 CFR § 1831(b)(3) provides as follows:
 

 (b)
 
 Purposes for which loan may not be made.
 
 While it is impracticable to list all of the purposes for which loans may be made, the following are those commonly requested by applicants which are not authorized.
 

 ******
 

 (3) Purchase of real estate, or the making of payments on, or the refinancing of any indebtedness secured by a lien on real estate other than the payment of taxes and interest as authorized in this subpart.