Gary NUTT, Plaintiff,

v.

The UNITED STATES, Defendant.

Howard SMITHSON, et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

Nos. 142–85C, 143–85C.

United States Claims Court.

May 15, 1987.

---

Steve Alexander, Arlington, Va., for plaintiffs.

Terrence S. Hartman, Washington, D.C., with whom was Asst. Atty. Gen. Richard K. Willard, for defendant.

## OPINION

NETTESHEIM, Judge.

These two consolidated actions for breach of express and implied-in-fact contract are before the court on defendant's renewed motion for summary judgment. Argument and supplemental argument have been held. The principal issues, broadly framed, are whether the lending entity has made the Government amenable to suit for breach of contract by incorporating allegedly infracted regulations into a loan document or by stating in the document that it will make or insure future loans or advances to aid the borrower, provided certain conditions are met.

## FACTS

Although many facts are disputed, the following have not been controverted. Plaintiffs Gary Nutt and Howard and Maretta Smithson (collectively referred to as "plaintiffs") operate farms in Castro County, Texas. Plaintiffs had outstanding loan agreements with the Farmers Home Administration (the "FmHA"), an agency of the United States Department of Agriculture, at the time the events that give rise to these claims occurred.

The FmHA grants farm operating loans to eligible borrowers who are unable to obtain reasonable financing elsewhere. 7 C.F.R. § 1941 (1983). The FmHA also makes "emergency loans" and various debt servicing options available to farmers, while administering the various loans, grants, and assistance programs under regulations promulgated by the Secretary of the Department of Agriculture.

Loans are made to an eligible borrower only after the FmHA determines that the borrower's plan of operation has a reasonable chance of success. 7 U.S.C. § 1941(a)(2) (Supp.1985); 7 C.F.R. § 1941.-12(a)(3) (1983). The FmHA's loan application evaluation process begins when a County Committee (the "Committee"), made up of three local farmers, determines whether a borrower is eligible for a loan. 7 C.F.R. § 1910.4(b). With assistance and recommendations from the County Supervisor, the Committee considers all relevant circumstances about the borrower's farming operation, including the borrower's farming record, proposal for use of the loan proceeds, and statement of the borrower's current financial condition—all as reflected in the Farm and Home Plan (the "FHP") submitted by the borrower. 7 C.F.R. §§ 1910.5, 1941.12. If the Committee finds the borrower to be eligible, it then certifies this result to the County Supervisor, 7 C.F.R. §§ 1941.30, 1945.180.

The County Supervisor has the actual authority to approve a loan. 7 C.F.R. § 1901.2. Once a favorable certification is made by the Committee, the County Supervisor determines whether the plan of operation is feasible and whether the loan is to be used for authorized purposes and can be repaid. 7 C.F.R. § 1941.33(b). After approving a loan, the County Supervisor forwards the loan request to the FmHA state office to issue and forward the loan proceeds. 7 C.F.R. § 1941.33(3).[1]

*Gary Nutt*

Between March 2, 1979, and March 29, 1983, plaintiff Nutt received 14 loans from the FmHA. To ensure payment of these loans, plaintiff and the FmHA executed several loan agreements and four security agreements that gave the FmHA liens of plaintiff Nutt's equipment, crops, and cattle. These security agreements included the following provisions:

IV. IT IS FURTHER AGREED THAT:

E. This Agreement is subject to the present regulations of the Secured Party and to its future regulations not inconsistent with the express provisions hereof.

. . . .

J. Secured Party will make or insure future loan advances to Debtor to enable him to raise or harvest farm crops or raise livestock or other animals, provided funds are available and the Debtor meets

---

**1.** The Federal Circuit described this regulatory framework and procedures in *Dahl v. United States,* 695 F.2d 1373, 1373–79 (Fed.Cir.1982).

all then current requirements imposed by regulations of the Secured Party.

Although plaintiff Nutt continued to receive credit from the FmHA until 1983, he was cautioned repeatedly by the FmHA to be more diligent in obtaining approval before disposing of items and accounting for the proceeds of sales of crops and cattle in which the FmHA had a security interest.

On July 28, 1983, plaintiff Nutt applied to receive FmHA services to help finance his wheat crop and cattle business. On August 11, 1983, Assistant County Supervisor Dean Saunders prepared a FHP for plaintiff, indicating that plaintiff would need a loan of $54,500. Eight days later the County Committee determined plaintiff to be ineligible for further FmHA services. The County Committee reversed its decision on August 25, 1983, and certified plaintiff as eligible. County Supervisor John Wolf submitted plaintiff's request to the FmHA State Office on August 31, 1983, which plaintiff Nutt alleges was accompanied by a revised financial farm analysis summary. The FmHA State Office rejected plaintiff's loan request on September 21, 1983. Plaintiff Nutt appealed this decision, but it was upheld by a FmHA hearing officer and deputy administrator.

On February 15, 1984, County Supervisor Wolf notified plaintiff Nutt that the FmHA intended to repossess chattels and take other legal action against property in which the FmHA had a security interest. Supervisor Wolf also notified plaintiff Nutt that he could request such loan servicing relief as consolidation, rescheduling, reamortization, or deferral. Plaintiff Nutt applied for consideration of such relief one month later, but Supervisor Wolf denied his application on May 21, 1984. This decision also was upheld on appeal.

### The Smithsons

Plaintiffs Smithson received 15 FmHA loans (both farm ownership and emergency) between 1972 and 1983. To ensure payment of these loans, the Smithsons and the FmHA executed several loan agreements and five security agreements. The security agreements contained provisions identical to those signed by plaintiff Nutt.

The Smithsons applied for FmHA services on January 10, 1984, and worked with County Supervisor Wolf later that month to devise a FHP. On February 2, 1984, Supervisor Wolf submitted the Smithsons' application to the State Office along with the FHP. The Smithsons allege that the FHP was based on figures other than those they supplied to Supervisor Wolf. The State Office responded on February 15, 1984, setting preconditions to plaintiffs' continued consideration for loan services. On March 8, 1984, Supervisor Wolf forwarded to the State Office a March 1, 1984 County Committee certification of eligibility, along with a February 23, 1984 revision of the FHP, which included a loan request for $265,000. By notice dated April 6, 1984, the State Office advised Supervisor Wolf that the Smithsons' loan was approved. By April 1, 1984, the Smithsons had surrendered 1,977 acres of land that they had leased and which they had indicated in the FHP they would farm in 1984. The Smithsons notified the FmHA on April 27, 1984, that they intended to decline the loan. Instead, on May 11, 1984, they requested loan servicing relief such as consolidation, rescheduling, reamortization, or deferral. The FmHA denied the Smithsons' request on June 8, 1984. They attempted to appeal the decision, but were told that decisions denying loan servicing relief were non-appealable.

Both cases were filed in this court on March 11, 1985. Defendant asserted counterclaims in each case for unpaid loan balances, plus interest. Defendant then filed a combined motion to dismiss and motion for partial summary judgment in *Smithson* on December 4, 1985. By order of March 6, 1986, the motion was treated as one for summary judgment, and the court denied the motion in part without prejudice, deferred decision on defendant's motion with respect to its counterclaim, and consolidated the cases. Defendant's renewed motion for summary judgment filed on July 3, 1986, and fully briefed after discovery in March 1987 addresses both cases.

Plaintiffs make claims for five instances of breach of express or implied-in-fact contract, as follows:

1. The FmHA failed to make or insure loans or advances (or subordination loans for plaintiff Nutt), to plaintiffs on a timely basis.

2. The FmHA refused plaintiffs' requests for loan servicing relief (such as consolidation, rescheduling, reamortization, or deferral) on existing loans.

3. The FmHA charged plaintiffs higher rates of interest than the maximum allowed by law on their operating and emergency loans.

4. When plaintiffs experienced income shortfalls below the amounts of income planned, the FmHA refused to consider their requests for release of security.

5. The FmHA refused to consider plaintiffs for "limited resource loan" interest rate (3% below regular FmHA loan interest rates).

### DISCUSSION

This court may grant summary judgment under RUSCC 56 when the record shows that there are no genuine issues as to any material fact and that the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *accord Johnson Controls, Inc. v. United States*, 8 Cl.Ct. 359, 365 (1985) (citing cases), *aff'd per curiam*, 795 F.2d 1011 (Fed Cir.1986). As the opponent of summary judgment, plaintiffs shall " 'receive the benefit of all applicable presumptions, inferences, and intendments.' " *Johnson Controls, Inc.*, 8 Cl.Ct. at 365 (quoting *Orchards v. United States*, 749 F.2d 1571, 1574 (Fed.Cir.1984), *cert. denied*, 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985)).

There are two central issues to be decided in these cases. The first is the extent to which the FmHA, by making reference in security agreements to the source of controlling law, incorporated all or any FmHA regulations into its loan agreements with plaintiffs such that any deviation by the FmHA from the letter of the law is actionable as a breach of contract. The second issue is whether the FmHA, by including in the security agreements a statement that it

"will make or insure future loans or advances" to an incumbent borrower (subject to funding availability and the borrower's compliance with current regulations) obligated itself contractually to provide such loans (or, additionally, all loan servicing actions) to qualified applicants.

■ 1. Jurisdiction in this court under the Tucker Act, 28 U.S.C. § 1491(a)(1) (1982), may be "founded either upon the Constitution or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." To recover money damages against the United States, a litigant must point either to some statute mandating the payment of money by the Government or to a breach of an express or implied-in-fact contractual obligation of the Government. *Eastport Steamship Corp. v. United States*, 178 Ct.Cl. 599, 605, 372 F.2d 1002, 1007 (1967). "Monetary claims which cannot be brought within these limits are beyond this court's jurisdiction, even though they may intimately involve the Constitution, an Act of Congress, or an executive regulation." 178 Ct.Cl. at 607, 372 F.2d at 1008.

The Court of Claims in *Eastport* gave a very thorough and cogent explication of the range of the court's jurisdiction. In refusing to find that the statute allegedly violated by the Maritime Commission was money-mandating, the court warned of the danger invited by a court's reading money-mandating status into a statute when that meaning is not clearly expressed by the statute. "If we were to infer from ... [the statute] an unexpressed summons to compensate plaintiff for its business loss, we would necessarily have to open the doors to similar claims by other applicants who suffer commercial damage from a wrongful denial of a license or permission by these other agencies (*or as a result of the agency's improper refusal to act*)...." 178 Ct.Cl. at 608, 372 F.2d at 1009 (emphasis added; footnote omitted). The court noted its responsibility to respect the bounds of its jurisdiction:

[W]e must follow the admonition of the Supreme Court, almost a century ago, 'to be cautious that we do not permit the decisions of this court to become authority for the righting, in the Court of Claims, of all wrongs done to individuals by the officers of the General Government, though they may have been committed while serving that Government, and in the belief that it was for its interest. In such cases, where it is proper for the nation to furnish a remedy, Congress has wisely reserved the matter for its own determination. It certainly has not conferred it on the Court of Claims.' *Gibbons v. United States, supra,* 75 U.S. (8 Wall.) [269] at 275–76 [19 L.E. 453].

178 Ct.Cl. at 611, 372 F.2d at 1011 (footnote omitted).

The implications of redressing under this court's jurisdiction over contract claims an alleged infraction of regulations are not to be underestimated. Judicial review, in any case, does exist. The question is whether review should be confined strictly to judicial monitoring under the Administrative Procedure Act, 5 U.S.C. §§ 551–59, 701–03 (1982) (the "APA"), of an agency's observance of its congressional prescriptives, or whether the matter should be viewed as one between two contracting parties and a court properly should interpose itself as a referee deciding the rights and responsibilities of the contracting parties. This conceptual dilemma was illustrated recently by the Supreme Court in a similar context. In *Wright v. City of Roanoke Redev. & Hous. Auth.,* —— U.S. ——, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987), tenants in low income housing projects sued under 42 U.S.C. § 1983 (1982), alleging a deprivation of federal rights by a housing authority because the Brooke Amendment to the Housing Act of 1937 allegedly imposed a rent ceiling that the housing authority had violated by overbilling the tenants for their utilities. A divided court held that the benefits Congress intended to confer on the tenants were sufficiently specific and definite to qualify as enforceable federal rights under section 1983. Although the holding is not germane, the dissent, in arguing that a statutory entitlement to judicial enforce-

ment had not been created, pointed instead to a lease provision that gave the tenants the right to enforce their overbilling charges as a matter of contract law:

HUD has developed a standard lease reflecting these requirements, *see* HUD Circular RHM 7465.8 (Feb. 22, 1971), which respondent's leases closely follow. Thus, respondent is contractually obligated to furnish, "as reasonably necessary," "hot and cold water, gas for cooking, electricity for lighting and general household appliances and heat at appropriate times of the year, and also range and refrigerator." If respondent fails to fulfill these obligations, petitioners may, like any other tenants, bring suit for breach of contract.

*Id.,* 107 S.Ct. at 779–80 (O'Connor, J., dissenting). This contract provision is the kind of explicit undertaking that, it is submitted, should be actionable in a court of law as a claim based on contract. The provision in the cases at bar incorporating wholesale an agency's regulations, attendant on no particular undertaking, are wholly dissimilar. The provision obligating the FmHA to make and insure future loans to aid a borrower, provided certain conditions are met, would seem to touch the outer limits of recognized contractual undertakings.

Judicial review under the APA and under contract theories has different theoretical justifications and serves different functions. Under the APA an aggrieved individual can seek review in federal district court to correct what he alleges to be an abuse of discretion by a government agency. The individual asks the court to compel the agency to change its behavior to conform to the requirements of controlling law. The value of such action is that it both compels the Government to comply with the law and enables the agency to correct its behavior on matters that often involve many others beyond the immediate plaintiff who are affected by programs granting benefits from the Government.

Review of contract claims justifiably is more limited and subject to very stringent requirements. Since the Government can

incur money damages in a contract action, the Government will be held to have obligated itself in contract only upon a showing of an express or implied-in-fact agreement to do so. This formidable standard serves to protect the fisc from all suits under contract claims except where the evidence guarantees with some certainty that the Government has agreed to waive its sovereign immunity. *See United States v. Testan,* 424 U.S. 392, 96 S.Ct 948, 47 L.Ed.2d 114 (1976). It also assures a necessary measure of flexibility to the Government in its daily operations so that it need not answer in damages for each false step or innocent legal error in administering the myriad of programs and functions that occupy its efforts.

The distinction between these two sorts of actions and their respective remedies is essential to the proper balance between protecting the justifiable, bargained-for expectations of the public and the proper exercise of discretion necessary to the smooth and efficient operation of the Government. It is important that a mere reference in the contract to the controlling regulations not be converted into a contractual promise at the risk of subverting this crucial distinction.

2. Plaintiffs in these cases make no claim that any of the statutes relied upon is money-mandating. Rather, they contend that a variety of FmHA regulatory duties and procedures became contractual obligations of the FmHA through a reference to the regulations in their contracts. These alleged obligations will be examined separately. Plaintiffs also claim that the FmHA contractually obligated itself to "make or insure future loans or advances" to plaintiffs, if qualified, by the FmHA's inclusion of that language in its security agreements with plaintiffs. Since the Smithsons' loan application was approved, their grievance under this claim is not that they were denied a loan, but that the FmHA failed to consider their application in a timely fashion. The Smithsons argue that this failure was a breach of contract since, they contend, FmHA regulations require timely processing of loan applications and the security agreements incorporated

these regulatory requirements as contractual obligations. Plaintiff Nutt, on the other hand, contends that the regulations were violated in the processing of his request for loan servicing.

 Unless a statute or regulation is money-mandating, the Government creates no legal right enforceable in the Claims Court to money damages by violating it. Yet, when entering into contracts, the Government may include any number of promises to conduct itself in a certain way, for example, by restating regulatory procedures and duties as contractual obligations of the Government. If the Government then violates those regulations, it may become liable for damages for breach of contract. *See Dahl v. United States,* 695 F.2d 1373, 1376, 1381 (Fed.Cir.1982). Similarly, the Government may exact promises from a party with whom it contracts that he will comply with all pertinent regulations. A violation of one of those regulations by the contracting party then becomes a breach of the contract. *See Dahl v. United States,* 695 F.2d at 1379; *Pettersen v. United States,* 10 Cl.Ct. 194, 199, *aff'd mem.,* 807 F.2d 993 (Fed.Cir.1986); *cf. Gross v. United States,* 205 Ct.Cl. 605, 613, 505 F.2d 1271, 1275–76 (1974) (Government's refusal to allow plaintiff's participation in agricultural program justified by plaintiff's violation of applicable regulations). However, these cases leave unclear the issue of how specific the contract's reference to regulations must be before they become contractual promises by the Government.

In *Pettersen* the court reaffirmed an administrative determination that a group of farmers had breached a contract with the Commodity Credit Corporation (the "CCC") by failing to limit the acreage of their crops, as required by an express contract term. In a separate term, both the farmers and the CCC agreed to comply with several specific regulations incorporated into the contract and included in the appendix to the contract. Although the court found both that the Government had not breached any part of the contract and that plaintiffs had breached a non-regulatory provision of the contract, the court did ex-

amine plaintiffs' allegation that the Government had violated one of the regulations incorporated into the contract. The court's willingness to entertain the claim supports the argument by plaintiffs in the instant cases that the Government's violation of a regulation incorporated into a contract can be the basis for a breach of contract action against the Government. However, the facts peculiar to *Pettersen* restrict the breadth of its holding. It is not insignificant, first, that the language incorporating the regulations was very precise: "The operator and each producer on the farm and CCC agree to comply with the terms and conditions specified in the Appendix to this contract." *Pettersen*, 10 Cl.Ct. at 198. Second, the regulations included in the appendix were specific and limited in number, as opposed to a wholesale incorporation of all applicable regulations.

*Gross* offers even less guidance. That case involved a dispute over payments made to a farmer under the Department of Agriculture's Feed Grain Programs. Although the Court of Claims analyzed violations of the regulations by both the Government and the farmer, the opinion never refers to any particular contract that might have incorporated the mentioned regulations. Instead, the court used the farmer's violation of several regulatory provisions and the Government's adherence to the regulations to justify the Government's decision to deny the farmer's participation in the Feed Grain Programs for one year and to seek a refund of monies paid to the farmer during other years. The interplay, if any, between the regulations and whatever contract may have been involved was left unstated.

Finally, in *Dahl*, the Federal Circuit examined an FmHA promissory note and security agreement, both of which contained the following language: "This note [or agreement] shall be subject to the present regulations of the Farmers Home Administration and to its future regulations not inconsistent with the express provisions hereof." 695 F.2d at 1376. The court stated, "The terms of the parties' agreement, including the controlling regulations, were incorporated into the promissory note and security agreement." *Id.* Plaintiffs had used the proceeds of an interim bank loan, to be repaid from an approved FmHA loan, to purchase real estate instead of personal property and had also increased their personal debt liability after approval of the FmHA loan. The FmHA then refused to release the proceeds of its loan and unilaterally closed a supervised bank account in which the funds had been deposited and withdrew the loan proceeds. Reversing the trial court, the Federal Circuit held that the FmHA was justified under the regulations in taking such action and therefore had not breached the contract. 695 F.2d at 1379. The court also ruled that plaintiffs had breached the contract because they had violated regulations prohibiting the use of loan funds to be used to purchase real estate. *Id.*

Interestingly, even though the implications of *Dahl* are that the FmHA had a duty under the contract to comply with all applicable regulations and that its alleged breach of contract was analyzed against that assumption, the appellate court's ultimate determination that the FmHA had not breached the contract by refusing to disburse the funds to plaintiffs does not reveal whether that duty to disburse owed its presence in the contract to incorporation from the regulations or, rather, was simply an express or implied term of the contract apart from any regulation. Because the court did not disclose whether the contract duty of the FmHA that it was examining had its origin in the regulations, it is not certain that *Dahl* stands for the proposition that the FmHA contract language quoted in that case created a contractual obligation by the FmHA to comply with all applicable regulations, violation of which can be the basis for breach of contract damages against the Government.

If the FmHA's contractual duty examined in *Dahl* had a non-regulatory origin, the court's observation that the quoted language served to incorporate the "controlling regulations" can be considered to refer only to plaintiffs' regulatory obligations under the contract (which were the basis of

the court's ruling that plaintiffs had breached the contract) and to be dictum concerning the FmHA's contractual obligations. The court simply noted that the regulations allowed the FmHA to close the bank account unilaterally and that plaintiffs' breach or default "was enough to authorize the unilateral termination of the account and loan." 695 F.2d at 1380. Such an analysis does not allow the inference that a regulation-based contractual obligation of the FmHA was at issue in that case. Therefore, despite *Dahl's* statement that the "controlling regulations ... were incorporated into the promissory note and security agreement," *Id.* at 1376, it is not certain that the court would have interpreted the incorporating clause of the contract to create a contractual obligation by the FmHA to comply with all applicable regulations and to be liable to suffer money damages for any deviation from them.

■ 3. *The Smithsons.* The Smithsons claim that the FmHA's delays in processing and finally approving their loan application caused them to suffer economic losses. They argue that the FmHA owed them a contractual duty to process their application in a timely fashion.[2] They cite 7 C.F.R. § 1910.6(a) (1983), which describes the sequence of events that should occur after an applicant has been deemed eligible for a loan. The Smithsons assert that the process described by the regulation became a contractual obligation of the FmHA to process applications "promptly" according to the process because the regulations were incorporated into their security agreement by section IV. E. of the agreement, which, again, reads: "This agreement is subject to the present regulations of the Secured Party and to its future regulations

not inconsistent with the express provisions hereof."

The Smithsons argue that this contract term incorporated all applicable regulations into the contract as affirmative obligations of the Government. Although this contract language is nearly identical to the contract provision in *Dahl,* the opinion in *Dahl* cannot be read as broadly as the Smithsons advocate. Had the FmHA intended to convert its FmHA regulatory duties into contractual obligations, it could have employed the language it used in *Pettersen, i.e.,* that the parties "agree to comply with the terms and conditions [including various regulations] specified in the Appendix to this contract." 10 Cl.Ct. at 198. Or, the FmHA could have drafted the term to state simply that the parties agreed to comply with all applicable regulations. Instead, the language that was included is far more susceptible to an interpretation that the terms and obligations of the contract would be both construed according to present regulations and subject to changes in the regulations not inconsistent with the contract's express provisions. Viewed in this way, the contract establishes the FmHA's regulations as a backdrop to, and occasional modifier of, express contractual obligations.

■ It is unreasonable to infer that the FmHA meant to obligate itself in wholesale fashion to comply with each FmHA regulation or risk breach of contract damages. Absent both an en masse incorporation of regulations and express or implied contractual promises by the FmHA to evaluate loan applications according to some time schedule, the Smithsons' breach claim based on timeliness must fail.[3]

---

**2.** During argument the Smithsons contended that in addition to approving their first loan request too late, the FmHA failed to consider a second loan application. However, this was their first mention of a second application. Neither their complaint nor their amended complaint states any claim based on a second application. By the time for argument on a motion for summary judgment (indeed, defendant's second such motion), it is far too late to amend the pleadings to add another claim, nor have the Smithsons moved to amend their complaint again.

**3.** The damages claimed by the Smithsons appear to include sums for loss of their farming operation and harm to their reputation in their community. Such damages are consequential in nature, and are not recoverable in this court. *Northern Helex Co. v. United States,* 207 Ct.Cl. 862, 886–87, 524 F.2d 707, 714–15 (1975), *cert. denied,* 429 U.S. 866, 97 S.Ct. 176, 50 L.Ed.2d 146 (1976) (only actual damages recoverable in breach of contract suit in this court).

*McCormick v. United States*, 227 Ct.Cl. 661 (1981), fails to add any merit to plaintiffs' claims based on timeliness. Plaintiff farmers in *McCormick* characterized the FmHA's alleged "improper supervision" of their loans as a breach of contract between the parties. The alleged improper supervision occurred because the County Supervisor had not closed plaintiffs' loans until after planting season had passed and then refused to grant them additional loans or modify their repayment schedule. Although the court's abbreviated discussion of the law, citing no cases on this issue, appears to indicate that abuse of discretion by an agency official may be grounds for a breach of contract claim, the court dismissed the case on summary judgment because plaintiffs had furnished no facts or allegations even tending to show an abuse of discretion. 227 Ct.Cl. at 664–65. More importantly, the court's alternative ground for finding no breach of contract was that plaintiffs' claim of abuse of discretion "is more properly characterized as alleging negligent misconduct on the part of" the County Supervisor and that "such a claim, sounding in tort, is not within this court's original jurisdiction...." *Id.* at 665. That holding instructs that when, as in the instant case, a plaintiff alleges that the FmHA delays a loan approval or fails to provide alternative loans or loan servicing relief, those claims should be brought as tort actions instead of breach of contract claims. Furthermore, *McCormick* never explains what contractual obligation the FmHA undertook or the source of the obligation and therefore does nothing to bolster plaintiffs' claims here.

■ By contrast to plaintiffs' claim based on an incorporation of FmHA regulations, their claims based on the FmHA's statement in ¶ IV. J. that the FmHA "will make or insure future loans or advances to Debtor to enable him to raise or harvest farm crops or raise livestock or other animals, provided funds are available and the Debtor meets all then current requirements imposed by regulations" of the FmHA are grounded in contractual language more

easily construed as an express promise by the FmHA. Whatever the motivation that prompted the FmHA to restate its loan policy as an affirmative contractual obligation toward an incumbent borrower, the language is clear. The FmHA's agreement to "make or insure future loans or advances" sufficiently supports plaintiffs' allegation that the FmHA obligated itself by that language, so that defendant's renewed motion for summary judgment would be denied if the Smithsons' claims were based on the FmHA's failure to "make or insure future loans or advances." However, the Smithsons received the loan they sought. They now complain that they were denied such other FmHA services as loan consolidation, rescheduling, reamortization, and deferral; release of security on existing loans; and a "limited resource loan" interest rate. In examining the plain meaning of the phrase "future loans or advances," there is no indication that the above-mentioned loan servicing actions are included. The FmHA did not violate its obligation to make or insure future loans by its alleged failure to provide various loan servicing actions. That the same application and same financial information might be used for both purposes does not serve to convert a promise to "make or insure future loans or advances" into one to provide all other loan servicing actions. If the FmHA had meant to bind itself to provide all loan servicing actions, too, it could have separately enumerated them in ¶ IV. J. or promised generally to provide all financial loan services available under FmHA programs. It did neither, and the contract provision must be given a plain reading of its intended meaning. The Smithsons' claims in counts 2 and 4 must fail as a matter of law.

Count 5 of the Smithsons' complaint claims that the FmHA breached the loan agreements by failing to consider them for a "limited resource loan" interest rate. It is unclear whether this loan-related option falls within the ambit of the "make or insure future loans or advances" language or whether plaintiffs seek to base this obligation on the alleged incorporation of the

regulations. However, even giving it the interpretation most favorable to the Smithsons, *i.e.*, as an auxiliary to the promise to the "make or insure future loans," this count fails because the Smithsons' request for a loan was approved by the FmHA.

Defendant has counterclaimed for the outstanding balance of eight loans made by the FmHA to the Smithsons. The total outstanding principal on these loans was $377,662.61 on the date defendant filed its counterclaim, July 25, 1985. In their answer the Smithsons admitted that the loans were made and were outstanding obligations. However, by way of defenses, they asserted alternatively that the FmHA failed to satisfy a condition precedent to the loan agreements by breaching either a duty to make or insure future loans or advances in a timely manner or a duty to provide other loan servicing actions. The Smithsons also had claimed under count 3 for the amount of interest charged them by the FmHA on their emergency loans in excess of the maximum rate allowed by law. The gravamen of this claim is that the FmHA failed to recompute its interest rates often enough and that the interest rates charged the Smithsons exceeded, at the time the various loans were made, the maximum amount allowed under the formula set forth in FmHA regulations. During supplemental argument counsel for the Smithsons advised that this claim was in the nature of an offset to defendant's counterclaim and did not seek recovery of amounts already paid.

4. *Gary Nutt.* For the reasons stated above with regard to the Smithsons' claims based on an incorporation of the regulations into the contract, plaintiff Nutt's claims based on failure to provide loan servicing relief and release of security fail. Defendant's renewed motion for summary judgment is granted as to these claims.

■ Plaintiff Nutt was denied an operating loan. His breach of contract claim for failure to provide this loan survives defendant's motion because of the express contractual promise made to him by the FmHA to "make or insure future loans or advances." [4] This claim must be tried. Since plaintiff Nutt's claim for a "limited resource loan" interest rate may be encompassed within the "make or insure loans or advances" language of his claim under count 1, count 5 must be tried also.

■ Plaintiff Nutt also makes a claim, that really is a defense to defendant's counterclaim, for excess interest charged on operating and emergency loans. This claim is supported by disputed material facts concerning the FmHA's interest computing practices and therefore survives defendant's motion. Because plaintiff Nutt also has asserted a breach of contract defense (the FmHA's failure to make or insure future loans) against defendant's counterclaim for the outstanding balance owed by plaintiff Nutt on his loans and because this breach issue has withstood defendant's motion, the counterclaim must also await trial. Summary judgment as to

---

4. To the extent that plaintiff Nutt's breach claim based on failure to "make or insure future loans or advances" seeks relief for the FmHA's alleged failure to consider him for loan subordination, First Amended Compl. filed Mar. 12, 1987, ¶¶ 2–3, this portion of the claim must be dismissed. During supplemental argument, counsel for plaintiff Nutt contended that the contractual language, "insure," was broad enough to encompass the concept of loan subordination. However, the distinctly separate treatment of these two terms in both the statutes and the regulations makes clear the different loan functions served by each..

Congress has provided FmHA authority to insure both operating loans, 7 U.S.C. §§ 1928, 1947, and emergency loans, 7 U.S.C. § 1968, and

has defined "insure" as a distinct term meaning "to guarantee the payment of a loan originated, held, and serviced by a private financial agency or other lender approved by the Secretary." 7 U.S.C. § 1991(a). Additionally, an "insured loan" can be one "directly made and serviced by the FmHA as the lender with funds from the Rural Development Insurance Fund, Rural Housing Insurance Fund, or Agricultural Credit Insurance Fund." 7 C.F.R. § 1980.6(a)(10). By contrast, the procedure that allows FmHA chattel liens securing existing operating, emergency, and economic emergency loans to "be subordinated to a lien of another creditor to permit that creditor to lend" to the borrower is set out separately as a loan servicing option at 7 C.F.R. § 1962.30.

defendant's counterclaim therefore is denied.

5. Pursuant to RUSCC 56(e), the following material facts are in dispute:

*Plaintiff Nutt's claim for failure to "make and/or insure future loans:"*

a. Whether plaintiff Nutt failed to account for security items and/or the proceeds therefrom (1979–81).

b. Whether plaintiff Nutt's loan application and supporting information, as supplied by him, should have established his creditworthiness.

*Plaintiff Nutt's interest overcharge claims:*

a. How often FmHA actually recomputed interest rates.

b. Which of plaintiff Nutt's loans is the interest rate in excess of the statutory maximum interest rate.

### CONCLUSION

Based on the foregoing,

IT IS ORDERED, as follows:

1. Defendant's renewed motion for summary judgment is granted insofar as the complaint in No. 142–85C will be dismissed as to counts 2 and 4 (incorporated by reference in the First Amended Complaint) and ¶¶ 1–4 of the First Amended Complaint and is denied as to counts 3 and 5 and defendant's counterclaim. Defendant's motion further is granted to the extent that count 1 of the complaint charges that the alleged obligation to "make and/or insure future loans" had to be discharged in a timely fashion.

2. Defendant's renewed motion for summary judgment is granted insofar as the complaint in No. 143–85C will be dismissed. Dismissal of the complaint deprives the court of jurisdiction over defendant's counterclaim, as well. The Clerk of the Court shall dismiss both the complaint in 143–85C and defendant's counterclaim.

3. Further proceedings pursuant to Appendix G are scheduled by separate order entered this date.